**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 24, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOSEPH R. FOX,

      Petitioner,

v.

SURFACE TRANSPORTATION
BOARD; UNITED STATES OF
AMERICA,

      Respondents.

_____

UNION PACIFIC RAILROAD
COMPANY,

      Intervenor.

No. 09-9529
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **McKAY**, and **BALDOCK**, Circuit Judges.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Joseph R. Fox appeals a ruling of the Surface Transportation Board (STB or Board), holding that a rail line owned by Union Pacific Railroad Company (UP) is subject to the STB's jurisdiction and has not been abandoned by UP. Exercising jurisdiction under 28 U.S.C. §§ 2321(a) and 2342(5), we affirm the Board's decision.

## *Background*

In 1977, UP and related rail carriers applied to the Interstate Commerce Commission (ICC) for authorization to abandon the Ironton Branch, a 1.87 mile rail line located in Provo, Utah. Pre-authorization from the ICC was a statutory requirement for abandonment of a rail line regulated by the ICC. *See* 49 U.S.C. § 1a (1976). In its notice of intent to abandon the Ironton Branch, UP indicated that part of the track would be retired and removed, but a portion of the track would remain in place and be reclassified as "yard track." Resp. App. at 20. In October 1977, the ICC issued a Certificate and Order authorizing UP to abandon the Ironton Branch, acknowledging that some track would remain in place and be reclassified as yard track. UP informed the ICC in December 1977 that a segment of the track had been removed and "abandoned," *id.* at 30, with the remaining portion to remain in place and be reclassified.

Mr. Fox owns property that lies adjacent to one of the segments of the Ironton Branch that UP reclassified as yard track in 1977. We will refer to this

segment of track as the Southern Segment.[1]  In 2008, Mr. Fox petitioned the STB

for a declaratory order that the Board does not have jurisdiction over the Southern

Segment, as a result of its abandonment by UP.

Mr. Fox does not dispute that UP used the Southern Segment for various

auxiliary purposes in support of its railroad operations between 1977 and 2007,

including for staging and storage of rail equipment, as a car repair facility, and

for storage of cabooses.  There is also no dispute that the Southern Segment

remained physically connected to UP's main line until 2006, when a switch was

removed.

UP presented evidence to the Board of the potential for converting the

Southern Segment for use as a transload facility to handle new traffic from

shippers in the region.  In a Verified Statement, a UP representative stated that an

increase in new manufacturing facilities in the area has resulted in an increase in

rail traffic.  He explained how the Southern Segment could be configured to

handle up to fifty rail cars per day, while allowing room for trucks to serve the

facility, and he also described why the Southern Segment is ideally suited for this

kind of facility.  He stated that UP has had discussions with six shippers about

possible movement of traffic using a Southern Segment transload facility.  The

_____

[1]     Although UP reclassified more than one segment of the Ironton Branch as
yard track in 1977, only the Southern Segment abuts Mr. Fox's property.  Thus,
the STB properly limited its decision to that segment.  *See* STB Decision, Resp.
App. at 3 n.4.

-3-

UP representative estimated the cost of converting the Southern Segment at roughly $2 million, which he indicated would be substantially lower than purchasing land and constructing such a facility at an alternative site, assuming that alternative were feasible.

The STB concluded that the Southern Segment falls within its exclusive jurisdiction under 49 U.S.C. § 10501(b)(2) and that UP has not abandoned it. Mr. Fox filed a timely appeal.

### *Standard of Review*

Under the Administrative Procedure Act, we will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *see also Swonger v. STB*, 265 F.3d 1135, 1140 (10th Cir. 2001) (applying § 706(2) standard in reviewing STB decision); *State Corp. Comm'n v. United States*, 894 F.2d 1141, 1142 (10th Cir. 1989) (applying § 706(2) standard in reviewing ICC decision).[2]

---

[2]   Although *State Corp. Comm'n* predates the STB, "the ICC Termination Act of 1995 . . . transferred the ICC's railroad-related functions to the STB and directed that the STB apply ICC precedent." *Swonger*, 265 F.3d at 1137 n.1.

*Discussion*

Mr. Fox contends that, by reclassifying the Southern Segment as yard track in 1977 pursuant to the ICC's abandonment authority, UP took it out of the national rail system and therefore "abandoned" it. He argues further that, as previously abandoned track, the Southern Segment did not subsequently become subject to the STB's jurisdiction under the ICC Termination Act of 1995 (ICCTA). And he claims that, even if the Southern Segment became subject to STB jurisdiction post-ICCTA, UP subsequently abandoned it. We conclude that the Southern Segment falls within the STB's exclusive jurisdiction under 49 U.S.C. § 10501(b)(2), and the Board's determination that UP has not abandoned it is supported by substantial evidence.

*A.*

As the STB explains in its brief, rail operations require both main lines, over which a carrier provides point-to-point service to shippers, and auxiliary lines, used for operations such as loading, reloading, classification, storage, and switching. *See* Resp. Br. at 3-5. As yard track, the Southern Segment is auxiliary track. It is also located entirely within one state.

The regulation of intrastate auxiliary track has changed over time. In 1977, the ICC had no authority over "the construction, acquisition, or operation of spur, industrial, team, switching, or side tracks if such tracks [were] located or intended

to be located entirely within one State."  49 U.S.C. § 1(18)(d) (1976).[3]  Therefore,

upon its reclassification from main line track to yard track in 1977, the Southern

Segment fell within this category of intrastate auxiliary track not regulated by the

ICC.

In 1995, Congress passed the ICCTA, Pub. L. No. 104-88, 109 Stat. 803

(1995), which did away with the ICC and transferred authority for railroad

regulation to the STB.  Under the ICCTA, the Board has exclusive jurisdiction

over "the construction, acquisition, operation, abandonment, or discontinuance of

spur, industrial, team, switching, or side tracks, or facilities."  49 U.S.C.

§ 10501(b)(2).  And the STB's exclusive jurisdiction over auxiliary tracks applies

"*even if the tracks are located, or intended to be located, entirely in one State*."

*Id.* (emphasis added).  Thus, Congress declared in the ICCTA that *intrastate*

auxiliary tracks—which were previously expressly outside of the ICC's regulatory

authority—were thereafter exclusively under the jurisdiction of the newly created

STB.  *See Port City Props. v. UP R.R. Co.*, 518 F.3d 1186, 1188 (10th Cir. 2008)

("[J]urisdiction over 'spur, industrial, team, switching or side tracks, or facilities'

rests solely with the STB." (quoting § 10501(b)(2))).  This court has characterized

---

[3]     Such intrastate auxiliary tracks were regulated by the states.  *See Ill. Commerce Comm'n v. I.C.C.*, 879 F.2d 917, 922 (D.C. Cir. 1989) (confirming "uniform view" that states had authority to regulate intrastate spurs); *see also City of Yonkers v. United States*, 320 U.S. 685, 690 (1944) (exemptions from ICC authority reflected "Congressional policy of reserving exclusively to the states control over that group of essentially local activities").

§ 10501(b)(2) as a "broad jurisdictional grant," which Congress "added in light of the exclusive Federal authority over auxiliary tracks and facilities," thus preempting state jurisdiction over spur and industrial tracks. *Port City Props.*, 518 F.3d at 1188 (quotation and brackets omitted).[4]

The Board found that UP continued to use the Southern Segment for various auxiliary purposes in support of its railroad operations as of the passage of the ICCTA. Therefore, the Board held that it became subject to the STB's jurisdiction under the plain meaning of § 10501(b)(2).

### B.

Mr. Fox argues that this court should set aside the Board's decision as not in accordance with the law. He asserts that UP abandoned the Southern Segment by reclassifying it as yard track in 1977. *See Preseault v. ICC*, 494 U.S. 1, 5 n.3 (1990) ("Once a carrier 'abandons' a rail line pursuant to authority granted by the Interstate Commerce Commission, the line is no longer part of the national transportation system, and although the Commission is empowered to impose

---

[4] The STB refers to the § 10501(b)(2) category of tracks as "excepted auxiliary track," Resp. Br. at 5, because a separate statutory provision excepts these tracks from the regulatory requirements set forth in Chapter 109 of Title 49 with respect to construction, acquisition, operation, abandonment or discontinuation of railroad lines. *See* 49 U.S.C. § 10906; *see also Port City Props.*, 518 F.3d at 1188 (holding that the combined effect of §§ 10501(b)(2) and 10906 is to preempt state jurisdiction over these tracks and to remove STB authority over their entry and exit). Because § 10906 is not at issue in this case, we will continue to refer simply to auxiliary track.

conditions on abandonments, as a general proposition ICC jurisdiction terminates." (citation omitted)).  And he asserts that, because a railroad carrier cannot undo an abandonment once it is consummated, UP cannot now invoke STB jurisdiction over the Southern Segment based upon § 10501(b)(2).  For this proposition, Mr. Fox cites *Fritsch v. ICC*, 59 F.3d 248, 253 (D.C. Cir. 1995); *RLTD Ry. Corp. v. STB*, 166 F.3d 808, 812 (6th Cir. 1999).

We agree with Mr. Fox that the ICC's authority over the Southern Segment terminated upon its reclassification as yard track in 1977 because, under the regulatory scheme in place at that time, the ICC had no authority over "the construction, acquisition, or operation of [intrastate auxiliary tracks]."  49 U.S.C. § 1(18)(d) (1976).  But in the ICCTA, Congress changed the regulatory scheme, creating new, exclusive federal jurisdiction over intrastate auxiliary tracks under the newly created STB.  And while the cases Mr. Fox relies on do stand for the general proposition that the Board has no jurisdiction over a rail line after its abandonment has been fully consummated, neither *Fritsch* nor *RLTD Ry. Corp.* dealt with the factual and legal issues presented here.  In these cases the carriers were attempting to assert ICC or STB jurisdiction over lines they had physically abandoned.[5]  Unlike this case, *Fritsch* and *RLTD Ry. Corp.* did not involve main

---

[5]      In *Fritsch*, the court concluded that a carrier had fully consummated abandonment of a line, noting that the carrier's "intent could not have been clearer . . . based on the letters it sent to the ICC, as well as its removal of

(continued...)

line track that a carrier had reclassified as intrastate auxiliary track under the ICC's abandonment authority. Nor had the tracks that were alleged to be abandoned in these cases been used for auxiliary purposes in support of the carriers' main line operations. And neither case addressed a carrier's assertion of federal jurisdiction after a major legislative change to the regulatory scheme.

Here, Mr. Fox does not contend that UP is attempting to assert STB jurisdiction over track that UP physically removed and retired pursuant to the ICC's abandonment authority. Rather, he bases his abandonment claim on UP's reclassification of the Southern Segment as yard track, which had the legal effect of terminating the ICC's regulatory authority over it. But there is no dispute that UP continued to use the Southern Segment as intrastate auxiliary track in support of its main line railroad operations as of the passage of the ICCTA. Therefore, under the plain meaning of § 10501(b)(2), the STB has jurisdiction over the Southern Segment.[6]

---

[5](...continued)
equipment." 59 F.3d at 253. Consequently, the court held, the ICC "had no jurisdiction to undo the abandonment." *Id.* In *RLTD Ry. Corp.*, the court found substantial evidence supporting the STB's determination that a segment of track had been abandoned where some of the track had been salvaged, portions of the line were paved over, and the only working connection between the line and the interstate rail system had long before been abandoned by a different carrier. *See* 166 F.3d at 812, 814. Therefore, the court affirmed the STB's determination that it did not have jurisdiction over the line, due to its abandonment. *See id.* at 814.

[6]    Mr. Fox contends that a savings provision in the ICCTA prevents the revival of federal jurisdiction over the Southern Segment under § 10501(b)(2).
(continued...)

*C.*

Mr. Fox argues that, even if the STB attained jurisdiction over the Southern Segment post-ICCTA, UP has since abandoned the line. Exercising its jurisdiction under § 10501(b)(2), the STB concluded that UP has not abandoned the Southern Segment.[7]

---

[6](...continued)
The ICCTA provided that:

> All orders, determinations, rules, regulations, permits, grants, loans, contracts, agreements, certificates, licenses, and privileges . . . that have been issued, made, granted, or allowed to become effective by the Interstate Commerce Commission . . . in the performance of any function that is transferred by this Act or the amendments made by this Act . . . that are in effect on the effective date of such transfer . . . shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the Board, any other authorized official, a court of competent jurisdiction, or operation of law.

Pub. L. No. 104-88, 109 Stat. 803, § 204(a) (1995). Based on this language, Mr. Fox reasons that the ICC's 1977 abandonment determination remains in effect, thereby preventing the STB from exercising jurisdiction over the track. But Mr. Fox ignores that the ICC's determination permitted UP to reclassify the Southern Segment as yard track. That classification has not been modified and is consistent with the STB's exercise of jurisdiction over the Southern Segment.

[7]     As noted above, *see* n.4, under 49 U.S.C. § 10906 the abandonment of auxiliary track is excepted from the STB's pre-approval authority. In its brief, the Board explains that, because it doesn't license abandonment of auxiliary tracks, "there is no administrative precedent on what constitutes 'abandonment' of such track." Resp. Br. at 16. n.27. Therefore, Mr. Fox, UP, and the STB applied precedent under 49 U.S.C. § 10903 regarding consummation of abandonment. Mr. Fox does not contend that the Board applied an incorrect legal standard.

In determining whether a carrier has consummated abandonment of a rail line, the focus is on the carrier's intent. *See Birt v. STB*, 90 F.3d 580, 585 (D.C. Cir. 1996). "[S]everal concrete actions . . . may indicate an intent to abandon: cessation of operations, cancellation of tariffs, salvage of the track and track materials, and relinquishment of control over the right-of-way." *Id.*; *see also* 49 C.F.R. § 1152.29(e)(2) (listing attributes of a fully abandoned line as "discontinued operations, salvaged . . . track, canceled tariffs, and inten[t] that the property be removed from the interstate rail network"). The Board made the following findings:

> It is undisputed that between 1977 and 2000, UP used the [S]outhern [S]egment for staging and storing rail equipment for customers and, for 3 years in the mid-1990s, as a car repair site. UP also stored cabooses on the line until it removed them in 2007. And Fox acknowledges UP's efforts to market the [S]outhern [S]egment for use as a team or as a transload facility to serve growing markets in Provo, UT.
>
> These actions contradict any intent to take this track segment out of the national rail system. UP's action removing the switch connecting the [Southern Segment] to its Provo Subdivision does not dictate a different conclusion; the switch can be easily replaced and therefore its removal did not sever the [Southern Segment] from the national rail network. In short, because UP has continued to use the [S]outhern [S]egment as part of the national rail network, and is seeking new customers to use it in the future, that segment remains within the Board's jurisdiction.

Resp. App. at 6-7 (citation omitted).

-11-

Mr. Fox contends the Board's findings are not supported by substantial evidence. Our review under the substantial evidence standard is "quite narrow." *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (quotation omitted).

> Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker. Substantial evidence requires more than a scintilla but less than a preponderance. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.

*Id.* (quotation omitted). Mr. Fox challenges the sufficiency of the evidence supporting the Board's finding that UP did not intend to permanently disconnect the Southern Segment from its main line, as well as its finding that the switch could easily be replaced. Having reviewed the record, we conclude there is substantial evidence to support the Board's decision.

We agree with Mr. Fox that UP's unverified statements in its brief before the STB that the switch can be "readily" restored, *see* Resp. App. at 44, 49, do not qualify as evidence supporting the Board's findings. But the record is nonetheless sufficient to support the STB's conclusions, regarding both the intended temporary nature of the disconnection of the line from UP's main line and the relative ease of replacing the switch. UP's Verified Statement provided details about its marketing of the Southern Segment as a transload facility, including its discussions with six potential customers. It asserted that the Southern Segment is particularly well-suited for this purpose and that an influx of

-12-

new manufacturing industries into the area would make it a viable use. UP estimated it would cost approximately $2 million to convert the Southern Segment into a transload facility. The Board could reasonably infer from this evidence that UP did not intend the disconnection of the line to be permanent, and that, in the event UP moves forward with converting the Southern Segment to a transload facility, replacement of the switch would be feasible in relation to the investment UP is willing to make to convert the tracks for that purpose. *See, e.g., St. Louis Sw. Ry. Co.--Abandonment--In Smith and Cherokee Counties*, 9 I.C.C.2d 406, 411 (I.C.C. 1992) (rejecting claim that limited track removal indicated carrier's intent to abandon and stating that "line could easily be restored to operations"), *vacated in part on other grounds*, 2002 WL 383570 (S.T.B. Mar. 6, 2002); *Norfolk S. Ry. Co.--Adverse Abandonment--St. Joseph County*, No. AB-290 (SUB-286), 2008 WL 391303, at *3 (S.T.B. Feb. 13, 2008) (rejecting claim that rail service was no longer feasible due to degradation of lines and removal of switch and noting acquiring carrier's willingness to invest money to rehabilitate track).

Notwithstanding Mr. Fox's contention that it is more reasonable to conclude that UP intended to permanently disconnect the line from its main line, the Board's decision that UP has not abandoned the Southern Segment is supported by substantial evidence. We decline Mr. Fox's invitation to reweigh the evidence. "Where there is substantial support in the record for the [Board's]

findings, it is not the court's function to substitute its own conclusions for those which the [Board] had fairly drawn from such findings." *State Corp. Comm'n*, 894 F.2d at 1144 (quotation omitted).

## *Conclusion*

The STB's decision is supported by substantial evidence, and is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. Therefore, the decision of the Surface Transportation Board is AFFIRMED.

Entered for the Court

Michael R. Murphy
Circuit Judge