In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2147

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

*Plaintiff-Appellee*,

*v.*

CHICAGO TRANSIT AUTHORITY,
a municipal corporation,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CV 229—**Robert M. Dow, Jr.**, *Judge.*

ARGUED JANUARY 21, 2011—DECIDED JULY 25, 2011

Before FLAUM, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Union Pacific Railroad Company owns a 2.8-mile-long right-of-way that it has leased to the Chicago Transit Authority (CTA) for almost 50 years. When it became too costly for the CTA to continue leasing the land, the CTA sought to condemn the land

and obtain a perpetual easement over it. Union Pacific filed for injunctive relief in federal district court, arguing that the state condemnation was preempted by the Interstate Commerce Commission Termination Act ("ICCTA" or "Act"), 49 U.S.C. § 10501(b). The district court agreed and granted the injunction. The CTA now appeals. Because we agree that the state condemnation is preempted by federal law, we affirm.

I.

Union Pacific operates railroad track throughout the United States and conducts a significant amount of freight shipping through Chicago. At the center of this litigation is a piece of railroad property owned by Union Pacific, which we refer to as the "Right of Way." The Right of Way consists of an elevated structure on a man-made enbankment, running east to west for approximately 2.8 miles from Laramie Avenue in Chicago to Harlem Avenue in Oak Park, Illinois. This property is roughly 90 to 95 feet wide along most of its length. It covers an area greater than 32 acres (approximately 1,407,812 square feet), and includes 23 bridges over local streets. On the Right of Way, Union Pacific operates three railroad tracks.

Union Pacific also leases approximately 40% of the Right of Way (just under 13 acres) to the CTA, which is a municipal corporation providing mass transportation services for the city of Chicago. In the leased property, the CTA owns and operates two electric-powered local rapid transit tracks that run parallel to Union Pacific's

three tracks. This arrangement between the CTA and Union Pacific has continued without interruption since 1962 and is governed by a written lease agreement.

Under the terms of the lease, the CTA must use the Right of Way only for passenger transportation, it must maintain its tracks in good condition, and it must get Union Pacific's approval before constructing new CTA facilities such as tracks, platforms, stations, and stairways. Union Pacific, however, maintains the Right of the Way and the joint facilities shared with the CTA, such as retaining walls, drainage facilities, and bridges. The distance between the CTA's and Union Pacific's closest tracks is approximately five feet for the entire length of the Right of Way. Because of this close proximity, Union Pacific must modify its regular maintenance procedures and use non-standard inspection procedures when maintaining the Right of Way. The lease also requires the CTA to reimburse Union Pacific for 40% of the cost of maintaining the Right of Way and the joint facilities, including constructing new joint facilities. Finally, the lease terminates if the CTA stops passenger transportation—other than temporary shutdowns for maintenance and repair—or if the CTA fails to make rental payments or to fulfill any of the lease's other conditions. As long as the CTA keeps its commitments, the lease does not expire but continues indefinitely.

In exchange for the use of the Right of Way, the CTA pays monthly rent to Union Pacific. Every ten years, the parties determine the monthly rent for the next ten-year period based on a formula specified in the lease and the

appraised fair market value of the Right of Way. For the 1992-2002 lease period, the CTA's monthly rent was approximately $25,000.

This dispute began when the parties were calculating the rent for the 2002-2012 lease period. They obtained conflicting appraisals of the Right of Way's fair market value: Union Pacific's appraisal was $30.8 million, while that of the CTA was $11.3 million. So, as provided by the lease, the parties arranged for a neutral appraiser who valued the property at $25.9 million—setting the monthly rent at approximately $90,000.

During this time, the parties discussed the possibility of negotiating a one-time payment in exchange for a permanent easement over the Right of Way instead of maintaining the current rental arrangement. Nothing came of this discussion. Then, in July 2006, the CTA made Union Pacific an offer: Union Pacific had 14 days to either accept $7,564,400 for a "perpetual easement" on the Right of Way or the CTA would condemn the property. Union Pacific declined the offer. True to its word, the CTA began condemnation proceedings with the Illinois Commerce Commission, an administrative agency of the State of Illinois. In the proceedings, the CTA requested a perpetual easement that would be "coextensive" with the lease. Notably, the CTA's petition specified that "the CTA's obligations, interests and rights under the easement shall run with the land and not be subject to termination for any reason."

To halt the condemnation, Union Pacific sought an injunction in federal district court, arguing that the con-

demnation was preempted by the Interstate Commerce Commission Termination Act. The district court agreed and granted summary judgment in Union Pacific's favor, holding that the condemnation was both categorically preempted and preempted "as applied." The CTA now appeals.

## II.

We review de novo the district court's grant of summary judgment. *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 941 (7th Cir. 2011). And we review de novo the district court's determination of the preemptive effect of a federal statute. *Vill. of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 786 (7th Cir. 2008); *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (determining ICCTA preemption).

## A.

The Supremacy Clause of the United States Constitution provides that the Constitution and laws of the United States are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, under the Supremacy Clause, federal law "preempts state laws that interfere with, or are contrary to, federal law." *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (internal quotation omitted). In determining preemption, we look to Congress's intent in enacting the federal

statute at issue. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).

In 1995, Congress enacted the Interstate Commerce Commission Termination Act and created the Surface Transportation Board to administer the Act. 49 U.S.C. §§ 10101, 10102(1). In the Act, Congress expressly conferred on the Board "exclusive" jurisdiction over the regulation of railroad transportation:

> The jurisdiction of the Board over—
>
>> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>>
>> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). Congress also defined "transportation" to include railroad property, facilities, and equipment "related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." 49 U.S.C. § 10102(9). Con-

gress's intent in the Act to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping.[1]

Here, there is no dispute that Union Pacific and its 2.8-mile Right of Way fall under the Act. Instead, the question at issue is whether the proposed state condemnation establishing a perpetual easement over the Right of Way is a regulation of railroad transportation preempted by the Act.[2]

---

[1] *See, e.g.*, *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 104 (2d Cir. 2009) (describing jurisdiction as "broad"); *Franks Inv. Co. v. Union Pac. R.R. Co.*, 534 F.3d 443, 449 (5th Cir. 2008) ("The language of the ICCTA's preemption provision, as well as the body of case law on the matter, evinces an intent by Congress to broadly preempt state law as it relates to rail transportation."); *City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 861 (8th Cir. 2005) ("Courts have recognized that Congress intended to give the Board extensive authority in this area."); *City of Auburn v. United States,* 154 F.3d 1025, 1030 (9th Cir. 1998) (noting that case law finds "a broad reading of Congress' preemption intent, not a narrow one").

[2] The district court held that condemnation can be a form of regulation, and we agree. The Act does not define the term "regulation." But as the district court noted, the dictionary definition of "regulation" is the "act or process of controlling by rule or restriction." Black's Law Dictionary 1398 (9th ed. 2009). And that is what is occurring here—the CTA wants to control a piece of land through the condemnation. The Board agrees with this understanding: "Condemnation can be a form of regulation, and using state eminent domain law to

(continued...)

Courts have treated preemption under the Act in a variety of ways. In 2005, the Board surveyed the different approaches in case law and suggested that there were two manners in which state or local actions or regulations could be preempted: (1) categorical, or *per se*, preemption, and (2) "as applied" preemption. *CSX Transp., Inc.—Petition for Declaratory Order*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2-3 (S.T.B. May 3, 2005); *see also New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008) (describing the Board's framework). Categorical preemption occurs when a state or local action is preempted on its face despite its context or rationale.[3] *Id* at *2. If an action is not categorically preempted, it may be preempted "as applied" based on

---

[2] (...continued)
condemn railroad property or facilities for another use that would conflict with the rail use is exercising control—the most extreme type of control—over rail transportation as it is defined in [49 U.S.C. §] 10102(9)." *Norfolk S. Ry. Co.—Petition for Declaratory Order*, STB Finance Docket No. 35196, 2010 WL 691256, at *3 (S.T.B. Feb. 26, 2010) (internal quotation omitted). Other courts have likewise agreed. *See Wisconsin Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wis. 2000); *Soo Line R.R. Co. v. City of St. Paul*, No. 09-2311, 2010 WL 2540695, at *4 (D. Minn. June 17, 2010).

[3] The Board described two types of categorically preempted actions: (1) "any form of state or local permitting or pre-clearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized" and (2) a "state or local regulation of matters directly regulated by the Board." *CSX Transp., Inc.*, 2005 WL 1024490, at *2.

the degree of interference that the particular action has on railroad transportation—this occurs when the facts show that the action "would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* at *3. In this case, the district court used the Board's suggested framework and found that the condemnation of the Right of Way was both categorically preempted and preempted "as applied." Union Pacific urges us to adopt the same approach.

We believe, however, that for the condemnation case before us, an "as applied" analysis is more appropriate than an analysis for categorical preemption. A condemnation is a peculiar type of regulation, one specifically limited in scope to the ownership or use of one particular piece of property. When considering a standard regulation—which is normally a rule of general applicability—using the Board's framework for both a categorical analysis and an "as applied" analysis makes sense: the regulation may be categorically preempted on its face, or based on the specific facts of the case it may be preempted "as applied" due to its effect on railroad transportation. By contrast, a condemnation is not a rule of general applicability because each instance necessarily varies with the facts of the case and the specific property subject to the condemnation.

Our review of case law analyzing condemnations also suggests using an "as applied" analysis. In the context of railroad crossings—a type of taking—one circuit court has discussed the Board's suggested framework and held that categorical preemption does not

apply in that context, and the "as applied" analysis should be used.[4] Also, other courts considering condemnations have not acknowledged the Board's framework or conducted a categorical preemption analysis, but have framed the issue by asking whether the action prevents or unduly interferes with railroad operations—which corresponds to the "as applied" analysis.[5] But perhaps most instructive is a case called *Norfolk Southern Railway Company*, issued by the Board in 2010. *Norfolk S. Ry. Co.—Petition for Declaratory Order*, STB Finance Docket No. 35196, 2010 WL 691256 (S.T.B. Feb. 26, 2010). Similar to the case before us, *Norfolk* involved a state condemnation of railroad property, but it was decided after the district court issued its opinion. The Board in *Norfolk* did not apply a categorical analysis, nor did it even mention the framework it previously suggested; instead, it conducted an "as applied" analysis, asking whether the condemnation of railroad property "would prevent or unduly interfere" with railroad transportation. *Id.* at *3. Given this trend in case law and

---

[4] *See New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332-33 (5th Cir. 2008).

[5] *See Island Park, LLC*, 559 F.3d at 104-06; *City of Lincoln*, 414 F.3d at 860-62; *Buffalo S. R.R., Inc. v. Vill. of Croton-On-Hudson*, 434 F. Supp. 2d 241, 248-49 (S.D.N.Y. 2006); *Dist. of Columbia v. 109,205.5 Square Feet of Land*, No. 05-202, 2005 WL 975745, at *3 (D.D.C. Apr. 21, 2005); *Maumee & W. R.R. Corp.—Petition for Declaratory Order*, STB Finance Docket No. 34354, 2004 WL 395835, at *2 (S.T.B. Mar. 2, 2004).

the fact-specific nature of the condemnation before us, we will use an "as applied" analysis.[6]

### B.

Using an "as applied" analysis, the question then becomes whether the state condemnation for a perpetual easement over Union Pacific's Right of Way prevents or unreasonably interferes with railroad transportation.

As a preliminary matter, we note that this is effectively a dispute between the parties over the appropriate amount of rent for the CTA's use of Union Pacific's property. The CTA is dissatisfied with the monthly rent arrangement that it agreed to when it first entered the lease. While it has the ability to end the lease and walk away from the arrangement, the CTA does not want to stop using the Right of Way. Instead, it wants to change the terms of the agreement and use Union Pacific's property in exchange for a one-time payment and a lower overall cost. This creates a unique situation in which a lessee is bringing condemnation proceedings against the lessor for property that the lessee already uses according to a lease agreement. The parties have not presented, and we are unaware of, any case law describing a similar scenario.

---

[6] Our decision to use the "as applied" analysis is limited to the case before us, and we make no ruling on how other cases should be addressed; a categorical analysis may be applicable in other regulation cases, including other condemnation actions.

If the CTA were not already using the Right of Way under the terms of the lease, this case would be straight-forward. The CTA's portion of the Right of Way consists of a 2.8-mile-long strip of land only five feet adjacent to heavy railroad traffic and covering an area just under 13 acres. This property is valuable railroad land owned by Union Pacific that Union Pacific could use for additional railroad lines if it was unoccupied. In *Norfolk*, the Board recognized value in railroad property that the railroad company was not using nor had any current plans to use, but which might be needed later for railroad purposes. *Norfolk S. Ry. Co.*, 2010 WL 691256, at *4.[7] Even if the property was not being used and Union Pacific had no immediate plans to use the property, a taking of this property would still prevent Union Pacific from using it for railroad transportation in the future. Moreover, since the portion of the Right of Way at issue is only a few feet beside Union Pacific's current rail-road tracks, a taking would unreasonably interfere with Union Pacific's existing railroad traffic—this is evident from the fact that Union Pacific currently must use non-

---

[7] *See also City of S. Bend v. Surface Transp. Bd.*, 566 F.3d 1166, 1169-71 (D.C. Cir. 2009) (affirming the Board's decision denying the city's request to take railroad lines that the owner was not using and had no present plan to use, but which might be used in the future); *City of Lincoln*, 414 F.3d at 860 ("Condemnation is a permanent action, and it can never be stated with certainty at what time any particular part of a right of way may become necessary for railroad uses.") (internal quotation omitted).

standard procedures to inspect and maintain the Right of Way. Courts have found federal preemption in cases involving takings of land that are smaller in area, that are less valuable for railroad transportation, or that are more distant from and less intrusive to active railroad operations.[8] In sum, if the CTA were not already using the Right of Way, there is no question that the condemnation would be preempted by federal law because it would have a significant impact on railroad transportation by preventing Union Pacific from using the property for railroad transportation and by unreasonably interfering with existing transportation on the neighboring tracks.

But here we come to the crux of the matter: the CTA already uses the Right of Way as a lessee and can continue to use the property in perpetuity as long as it upholds its obligations under the lease. This fact is important—it is the foundation for the CTA's entire legal position. From this premise, the CTA argues that since the perpetual easement it seeks is "coextensive"

---

[8] *See, e.g.*, *City of Lincoln*, 414 F.3d 858 (five-block-long strip of land that would interfere with storage and loading); *City of N. Little Rock v. Union Pac. R.R. Co.*, No. 10-01689, 2011 WL 1519374 (E.D. Ark. Apr. 21, 2011) (30-foot-wide trail that would interfere with loading and dealing with derailments); *Soo Line R.R. Co.*, 2010 WL 2540695 (2.1-mile-long strip of land approximately 33 feet away from railroad line); *Norfolk S. Ry. Co.*, 2010 WL 691256 (3.4-acre strip of land not used for railroad traffic, adjacent to but at a lower grade to existing railroad lines).

with the current terms of the lease, the proposed condemnation would not change the status quo of activity on the Right of Way in any manner. And therefore, since its relationship with Union Pacific and its use of the property would not change following the condemnation, there is no interference with railroad transportation and, hence, no federal preemption.

The CTA's position is logically flawed. The fact that railroad operations on the Right of Way would be the same both before and after the condemnation is only a coincidence due to the unique and peculiar scenario in this case: here, the lessee seeks to condemn property in order to use it in the same manner it already does according to a preexisting agreement with the lessor. But in fact, the condemnation does change the status quo of the property. Currently, the use of the property is the result of a lease. Should the CTA prevail, the use would be the result of a condemnation. And this is significant. Federal preemption does not apply to *all* situations where the use of property prevents or unreasonably interferes with railroad transportation; it applies to those situations where a *regulation* prevents or unreasonably interferes with railroad transportation. If a state or local government secures the use of property in a way that affects railroad transportation by contract or other agreement, there is no issue of federal preemption; but if it attempts to secure such use by regulation (in this case, by condemnation), then the possibility of federal preemption may arise.

The CTA's use of the Right of Way has a significant impact on railroad transportation: it prevents Union

Pacific from using the property itself for additional tracks; and it affects Union Pacific's current railroad operations, including requiring Union Pacific to use non-standard procedures to maintain the Right of Way. Currently, this presents no federal preemption issue because Union Pacific has agreed to this significant impact on railroad transportation through its lease with the CTA. But with the condemnation, the CTA is seeking, by regulation and not by agreement, to use Union Pacific's property in a way that has a significant impact on railroad transportation. And a regulation (instead of an agreement or contract) that prevents or unreasonably interferes with railroad transportation is preempted by the Act. Therefore this condemnation is preempted.

We noted above that this case where a lessee seeks to condemn property that it already uses under a lease is unique. We are not aware of, and neither party has cited, any case law describing a similar situation. Even so, we believe case law is consistent with our holding. In all the cases where courts have found that a condemnation was not preempted by the Act, the condemnation was for a new use of railroad property and such new use was sufficiently insignificant that it did not unreasonably interfere with railroad transportation.[9] In the

---

[9] Most cases where there was no unreasonable interference with railroad transportation are instances of non-conflicting and non-exclusive easements across railroad property such as road crossings and utility easements. *See, e.g.*, *Lincoln Lumber*

(continued...)

case before us, however, the use of the property is not insignificant as it prevents Union Pacific from using the land itself for new railroad tracks and it significantly affects Union Pacific's current railroad operations. The determination of "no unreasonable interference" has been limited to cases where a new use of property has an insignificant impact on railroad transportation. The CTA, however, is asking us to expand the meaning of "no unreasonable interference" to a case where the use of property has a significant impact on railroad transportation but is the same before and after a condemnation. We decline to do so in this case. Even though there may be no change in the state of railroad operations on the Right of Way, the condemnation is preempted by federal law because it is a regulation, and not a contract or other agreement, that has the effect of preventing and unreasonably interfering with railroad transportation.

We note that this reasoning applies even if the perpetual easement is entirely coextensive with the lease: before the condemnation, the parties' relationship in using the Right of Way is the result of an arms-

---

[9] (...continued)
*Co.—Petition for Declaratory Order*, STB Finance Docket No. 34915, 2007 WL 2299735 (S.T.B. Aug. 10, 2007) (sewer easement); *Maumee & W. R.R. Corp.*, 2004 WL 395835 (road crossing). The remaining cases are instances of land takings sufficiently distant from railroad operations to present no unreasonable interference. *See, e.g.*, *Bayou DeChene Reservoir Comm'n v. Union Pac. R.R. Corp.*, No. 09-0429, 2009 WL 1604658 (W.D. La. June 8, 2009); *Dist. of Columbia*, 2005 WL 975745.

length agreement between them, while after the condemnation, the same shared-property arrangement has been imposed upon Union Pacific by regulation. This raises the issue of preemption, even if the relationship and property rights of the parties are the same both before and after the condemnation.

But the CTA's argument fails for a second reason because despite its claim to the contrary, the perpetual easement is *not* coextensive with the lease as the parties' relationship and property rights do change after the condemnation. Under its terms, the lease terminates if the CTA ceases using the Right of Way for passenger transportation, if it fails to make rental payments, or if it violates any of the agreements specified in the lease. In contrast, under the easement, the CTA's rights would "not be subject to termination for any reason." Thus, with the condemnation, Union Pacific loses certain property rights, namely, (1) the right to reclaim the property if the CTA ceases passenger transportation operations on the Right of Way or violates any term of the lease, and (2) the right as a lessor to oust the CTA from the Right of Way if the CTA fails to meet its lease obligations.

The CTA contends that these rights are entirely insubstantial because the likelihood of Union Pacific regaining use of the Right of Way is speculative and because Union Pacific would still have other legal means to enforce the CTA's compliance with its obligations. We disagree. The right to reclaim the property is valuable despite not knowing whether the CTA will willingly or

unwillingly vacating the property in the foreseeable future. The railroad corridor through Chicago is valuable for railroad transportation, and although Union Pacific has no current plans to use the property because of the CTA's operations, there is little doubt that it would be used whenever it became available. In addition, the fact that Union Pacific would have available legal remedies to enforce an easement's obligations does not make these remedies equivalent to those it has as a landlord; a lessor with the ability to oust the lessee if it fails to uphold its lease obligations is in a stronger position than a party filing a lawsuit to enforce the terms of an easement. In short, Union Pacific would lose valuable property rights in the condemnation, and the CTA would gain perpetual control of the property without it being subject to termination—a manner of control that the CTA currently does not enjoy.

III.

Contrary to the CTA's claim, the easement is not coextensive with the lease. But even if it were coextensive, the condemnation is still preempted because it prevents and unreasonably interferes with railroad transportation on the Right of Way. The mere fact that the Right of Way is already used in an identical way pursuant to a lease agreement is irrelevant; the Act preempts state or local regulations, not contracts or other agreements, that have a significant impact on railroad transportation. The CTA can always ask Union Pacific to enter into a new lease arrangement for the Right of Way with fin-

ancial terms more acceptable to the CTA, but an attempt to obtain such an arrangement by regulation is preempted by federal law. The judgment of the district court is AFFIRMED.[10]

---

[10] Union Pacific also challenges the state condemnation on the basis that it violates the Commerce Clause of the United States Constitution. *See* U.S. Const. art. I, § 8. Like the district court, we decline to consider this question because the federal preemption issue is dispositive.