In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3580

HENRY C. WEDEMEYER and
MARTHA L. WEDEMEYER,

*Plaintiffs-Appellants,*

*v.*

CSX TRANSPORTATION, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:13-cv-00440-LJM-WGH — **Larry J. McKinney**, *Judge.*

ARGUED JANUARY 11, 2017 — DECIDED MARCH 10, 2017

Before FLAUM, EASTERBROOK, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge*. In 1989, CSX Transportation successfully petitioned the Interstate Commerce Commission (the "ICC") to end CSX's obligation to provide common-carrier rail service on a portion of track in Putnam County, Indiana. The following year, CSX notified the ICC that it had abandoned that segment. Shortly thereafter, CSX leased a portion

of its track, including the abandoned segment, for use by a grain-shipping company.

The Wedemeyers own property adjoining the abandoned track segment. They sued CSX seeking removal of the tracks and possession of the real property underlying the rail line. CSX moved for summary judgment, and the district court granted its motion, finding that the Wedemeyers' claims were preempted under the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501(b). We affirm.

## I. Background

CSX is one of the largest rail transportation companies in the United States and a "rail carrier"[1] under the ICCTA. CSX's rail network consists of approximately 21,000 route miles spanning 23 states, including Indiana. Historically, CSX and its predecessors operated two primary rail lines through Putnam County, Indiana: (1) a north-south line running from Chicago, Illinois, to Cloverdale, Indiana; and (2) an east-west line between Indianapolis, Indiana, and Decatur, Illinois. These two lines intersected in Roachdale, Indiana. CSX acquired the portion of the east-west line at issue by a deed dated 1876 and an instrument of appropriation dated 1879 conveyed to CSX's predecessor railway company. CSX has continuously operated trains through Roachdale over the east-west line since at least 1966.

---

[1] Section 10102(5) of Title 49 of the United States Code defines "rail carrier" as "a person providing common carrier railroad transportation for compensation, but … not … street, suburban, or interurban electric railways not operated as part of the general system of rail transportation."

In 1989, CSX filed a petition for an exemption with the ICC seeking to end CSX's obligation to provide common-carrier rail service on a 26.73-mile segment of mainline track on the east-west line (from Milepost 132.45 near Mitchellville, just outside of Indianapolis, to Milepost 159.18 near Roachdale). The ICC granted CSX's petition, thereby giving CSX conditional authority to end its obligation to provide common-carrier rail service on that track segment, which would no longer be "mainline track." CSX then had several options with respect to this track, including continuing to utilize it as non-mainline track, *e.g.*, as industry, spur, team, switching, or side track (collectively, "auxiliary track");[2] or physically removing the track.[3] In 1990, CSX notified the ICC that it had "abandoned" the segment.[4]

---

[2] These terms refer to various private or secondary uses of track, such as to serve a particular industrial site, to allow loading and unloading of railcars, or to order and organize rail traffic.

[3] CSX included this explanation in its statement of undisputed material facts, to which the Wedemeyers failed to respond. To the extent that this statement sets forth a legal proposition rather than a factual statement, we note that it is nonetheless accurate, *see, e.g.*, *Fox v. Surface Transp. Bd.*, 379 F. App'x 767, 771–72 (10th Cir. 2010) (discussing track reclassified as auxiliary yard track after abandonment); *Union Pac. R.R. Co.—Abandonment Exemption—In Weld Cty., CO*, No. AB-33, 2004 WL 2202235, at *1 (S.T.B. Sept. 30, 2004) ("After abandonment, the line will be converted to an industry track … ."); *The Atchison, Topeka and Santa Fe Ry. Co.—Abandonment Exemption—In Lyon Cty., KS*, No. AB-52, 1991 WL 120344, at *3 (I.C.C. June 11, 1991) (concluding that track that was once part of a rail line cannot be unilaterally converted into a spur without appropriate abandonment authority); *The Atchison, Topeka and Santa Fe Ry. Co.—Abandonment Exemption—Lawrence, KS*, No. AB-52, 1988 WL 225784, at *1 (I.C.C. Feb. 1, 1988) ("Following the abandonment, [the railroad] will reclassify the track as spur and will continue to serve [the shipper] … .").

Since at least 1990, CSX has provided rail service to a Roachdale grain-shipping facility located adjacent to CSX's track, to the east of the north-south line. Beginning in 1992, CSX leased a portion of the track to the grain shipper for use at its facility. The lease granted the grain shipper the right to use (1) the CSX mainline track west of Milepost 159.18, which connected to the north-south line at Milepost 159.80 (continuous mainline track), and (2) the abandoned track east of Milepost 159.18 (former mainline track). The leased track has been used for the storage and switching of empty inbound railcars and loaded outbound railcars. CSX also retained the right under the lease to switch railcars on the tracks as needed to conduct its own railroad operations, and to operate over the leased track with its own locomotives and rail equipment. Between 2001 and 2014, CSX transported more than 15,000 carloads from the grain facility using the tracks.

Henry ("Kit") Wedemeyer and Martha Wedemeyer own real property in Roachdale that adjoins approximately 2,588 feet of the former mainline (now auxiliary) track east of Milepost 159.18. The Wedemeyers were aware of the rail line and its active use when they took up residence on the property in 2003, accepted the deed to the property in 2005, and constructed their residence adjacent to the rail line. Kit also grew

---

[4] The district court opinion, CSX's Local Rule 56.1 statement, and the parties' briefs on appeal simply state that CSX "abandoned" the track segment at this time. However, the declaration of Jo Ann Burroughs, Manager of Network Services for CSX, to which the briefs cite, clarifies at paragraph eight that when CSX seeks authority to "abandon" lines, such as the 26.73-mile segment from Roachdale to Mitchellville, the track segment is abandoned only for purposes of providing common-carrier rail service. This is in contrast to instances of complete abandonment, where any and all rail use ceases and/or the tracks are removed.

up on the property and recalls trains using the rail line adjacent to the property as far back as the late 1960s. The rail line remained in place and operational during the Wedemeyers' entire period of residence and ownership.

The Wedemeyers first complained to CSX about the railroad operations on the track adjacent to their property on or about August 2, 2013. In or around September 2013, when the Wedemeyers learned that CSX claimed to control the uses of the track in question, Kit spoke by telephone to Leah Weider, the CSX Transportation Property Services Group Manager, and directed CSX to vacate and cease any further entry onto the property.

In November 2013, the Wedemeyers filed in Putnam Superior Court a "Complaint to Quiet Title and for Trespass and Ejectment and Permanent Injunction," which sought "immediate and sole possession" of the real property underlying the rail line and demanded that CSX "remove its ties, rails, and ballast" from the rail line. The Wedemeyers' complaint alleged that CSX had abandoned the track at issue in December 2003, pursuant to a settlement agreement and declaratory judgment filed in an Indiana state-court class action—*Clark v. CSX Transp., Inc.*, No. 29D03-9308-CP-404 (Hamilton Cty. Super. Ct.). The declaratory judgment, which was filed in 2004, stated in relevant part:

> 4. Where the title held by CSX to that portion of the Settlement Corridor has been determined pursuant to the Settlement Agreement to be less than fee title, the designation of "Easement" appears in the column titled "Interest Status" in Exhibit A. With respect to these portions of the Settlement Corridor, the Court declares that the

> Settlement Class Member's title to the portion of
> the Settlement Corridor adjacent to their prop-
> erty is superior to any claims of title by CSX,
> subject to any prior adjudication of title in a
> Court of law in which the Class Member's title
> or the title of the Class Member's predecessor in
> interest was determined not to be superior to
> the title of CSX.

The Wedemeyers' predecessor-in-interest, Kit's stepfather, had opted into the *Clark* class, and had filed affidavits of ownership with the Putnam County Recorder in 2004, stating that he held superior title to the property underlying the rail line. He later conveyed the property to the Wedemeyers.

CSX removed the case to federal court and later moved for summary judgment, arguing that the ICCTA preempted the Wedemeyers' state-law claims and that their claims were barred as a matter of law by the applicable statute of limitations and by equitable doctrines. The Wedemeyers failed to include a Local Rule 56.1 "Statement of Material Facts in Dispute" in their response to CSX's motion for summary judgment. They contended, however, that their claims were not preempted because they sounded in contract (*i.e.*, the settlement agreement in *Clark* as confirmed by the declaratory judgment) and thus did not constitute a "regulation" under the ICCTA. They also argued that the statute of limitations did not begin to run until 2013, when Kit spoke with CSX.

The district court held that because the Wedemeyers sought to use state law to regulate (*i.e.*, terminate) CSX's use of the easement, their claims were preempted under the ICCTA. The court concluded that "regulation" did not refer only to a state regulation or action, but rather, to controls or

limitations of any kind on the use of rails. The court also rejected the Wedemeyers' argument that the declaratory judgment was a contractual arrangement to which ICCTA preemption ought not apply, finding that the judgment "merely decided the nature of CSX[]'s property interest in the subject land" without "chang[ing] the fact that the ICCTA preempts any attempt to regulate rail transportation." This appeal followed.

## II. Discussion

We review de novo a district court's grant of summary judgment, construing all facts and drawing all reasonable inferences in favor of the non-moving party—here, the Wedemeyers. *See C.G. Schmidt, Inc. v. Permasteelisa N. Am.*, 825 F.3d 801, 805 (7th Cir. 2016) (citation omitted). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *C.G. Schmidt*, 825 F.3d at 805. We also review de novo the district court's determination of the preemptive effect of a federal statute. *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011).

The ICCTA abolished the ICC, transferring its functions to, and conferring "exclusive" jurisdiction over the regulation of railroad transportation on, the Surface Transportation Board:

> The jurisdiction of the Board over—
>
> > (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes,

services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). Congress defined "transportation" broadly to include railroad property, facilities, and equipment "related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." *Id.* § 10102(9). The Act does not define "regulation," but we have observed that "Congress's intent in the Act to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping." *Union Pac. R.R. Co.*, 647 F.3d at 678 (collecting cases).

The STB has explained that there are two manners in which state or local actions could be preempted: (1) categorical, or per se, preemption, and (2) as-applied preemption. *See CSX Transp., Inc.—Petition for Declaratory Order*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2–3 (S.T.B. May 3, 2005). "Categorical preemption occurs when a state … action is preempted on its face despite its context or rationale," such as when state preclearance could be used to deny a railroad

the ability to conduct some part of its operations, or when a state regulates matters directly regulated by the STB (*e.g.*, the construction, operation, and abandonment of rail lines). *Union Pac. R.R. Co.*, 647 F.3d at 679 (citation omitted); *id*. at 679 n.3 (citation omitted). An action may be preempted "as applied" based on the degree of interference that it has on railroad transportation—that is, if the action would have the effect of preventing or unreasonably interfering with railroad transportation. *Id.* at 679 (citation omitted).

CSX argues, and the district court agreed, that because the Wedemeyers seek to end all rail transport on the track in question, their claims are preempted as applied. CSX relies on *Union Pacific Railroad*, in which we held that the Chicago Transit Authority's condemnation action seeking to take possession of a portion of railroad property could be a form of regulation preempted by the ICCTA. 647 F.3d at 682–83. We noted that Black's Law Dictionary defined "regulation" as the "act or process of controlling by rule or restriction," 647 F.3d at 679 n.2 (citing *Regulation*, Black's Law Dictionary (9th ed. 2009));[5] and concluded that because the CTA was seeking to control a piece of land through condemnation, its action constituted regulation of rail transportation and preemption obtained, *id.* at 683; *see also Norfolk S. Ry. Co. & the Ala. Great S. R.R. Co.—Petition for Declaratory Order*, STB Finance Docket No. 35196, 2010 WL 691256, at *3 (S.T.B. Feb. 26, 2010) ("using state eminent domain law to condemn railroad property or facilities for another use that would conflict with the rail use is exercising control—the most extreme type of control—over

---

[5] The current edition still defines "regulation" as "[c]ontrol over something by rule or restriction." *See Regulation*, Black's Law Dictionary (10th ed. 2014).

rail transportation as it is defined in [49 U.S.C. §] 10102(9)")
(internal quotation marks omitted).

The Wedemeyers respond that their claims are not
preempted because their right to ownership and control
sounds in contract—that is, the settlement agreement entered
into voluntarily by CSX and the *Clark* class, as confirmed by
the declaratory judgment.[6] They also cite to *Union Pacific Rail
Co.*, in which we cautioned:

> Federal preemption does not apply to *all* situa-
> tions where the use of property prevents or un-
> reasonably interferes with railroad transporta-
> tion; it applies to those situations where a *regu-
> lation* prevents or unreasonably interferes with
> railroad transportation. If a state or local gov-
> ernment secures the use of property in a way
> that affects railroad transportation by contract
> or other agreement, there is no issue of federal
> preemption; but if it attempts to secure such use
> by regulation (in this case, by condemnation),
> then the possibility of federal preemption may
> arise.

647 F.3d at 682; *see also PCS Phosphate Co. v. Norfolk S. Corp.*,
559 F.3d 212, 218–19 (4th Cir. 2009) ("Voluntary agreements
between private parties, however, are not presumptively reg-
ulatory acts, and we are doubtful that most private contracts
constitute the sort of 'regulation' expressly preempted by the
statute. … Such a broad reading of the preemption clause

---

[6] CSX notes in a footnote in its response brief that the settlement agreement
is not in the record on appeal, but does not appear to dispute that the *Clark*
declaratory judgment is the result of a settlement agreement.

would make it virtually impossible to conduct business, and Congress surely would have spoken more clearly, and not used the word 'regulation,' if it intended that result.") (footnote omitted).

If the declaratory judgment did in fact memorialize CSX's agreement to "release all claims to the right of way, and remove the track from use and abandon it," as the Wedemeyers purport in their briefs, then their claims would likely escape preemption. The settlement, however, does not deal with the use of the track in question. Rather, the agreement in *Clark*, as memorialized by the declaratory judgment, appears to do no more than decide the nature of CSX's property interest in the land (*i.e.,* fee title versus easement), and the superiority of property interests as between CSX and the class members. The declaratory judgment and parties' briefs confirm that CSX had only an easement with respect to the tracks at issue.[7] However, the judgment does not establish that CSX ever gave up their right to enter and use the land. Although paragraph 1 of the judgment does reference "the abandoned railroad corridor," this language appears to refer to CSX's abandonment of common-carrier service on the track, not a wholesale abandonment of all rail service or use of the track.

The Wedemeyers seek to establish that CSX did in fact completely abandon its easement (and thus pull us into the merits of their claims) by citing to two Indiana cases: *Consolidated Rail Corp. v. Lewellen*, 666 N.E.2d 958 (Ind. Ct. App. 1996), *opinion adopted*, 682 N.E.2d 779 (Ind. 1997), and *Howard v.*

---

[7] Exhibit A referenced in paragraph 4 of the declaratory judgment was not attached to the judgment or included in either parties' appendices; but CSX does not dispute the Wedemeyers' claim that CSX had only an easement with respect to the track at issue.

*United States*, 964 N.E.2d 779 (Ind. 2012). In *Lewellen*, co-defendant Conrail had discontinued rail service over a corridor and removed the tracks and materials, and then attempted to transfer its property interest to Rails to Trails, Inc., a non-profit that converted unused rail corridors into public trails. 666 N.E.2d at 960. Landowners filed a class-action suit alleging that Conrail's easements had extinguished upon Conrail's abandonment of the line, such that any rights of way reverted back to the landowners. *Id.* at 960–961. The court concluded that because Conrail held only a right-of-way easement in the railroad corridor, Conrail's abandonment of the tracks triggered an extinguishment of the railroad's interest, with ownership reverting to the fee simple owner. *Id.* at 961–63.

In *Howard*, another "rails to trails" case, the Indiana Supreme Court responded to a certified question from the Court of Federal Claims and explained that "[t]he extent of the easement interest is determined by the purpose served by the easement." 964 N.E.2d at 781 (citing *McCauley v. Harris*, 928 N.E.2d 309, 314 (Ind. Ct. App. 2010); *N.Y. Cent. R.R. Co. v. Yarian*, 39 N.E.2d 604, 606 (Ind. 1942)). The Indiana Supreme Court held that the original purpose of the easement at issue in *Howard* was the transportation of goods through operation of a railroad line, and thus, the easement could not be "recast for use as a public recreational trail without exceeding the scope of the easement and infringing the rights of the landowners." *Id.* at 783; *see also id.* at 784 ("The transformation of a line of railway to a public trail imputes a different purpose. The operation of a railroad line is a commercial enterprise of transport. Whereas as [sic] public trail is an activity of recreation, not transportation.") (internal quotation marks and citation omitted).

The Wedemeyers claim that the original purpose of the track at issue in this case was for mainline rail service between Indianapolis and Decatur; thus, they contend, the shift in use to auxiliary track ought to extinguish the easement. However, the operative 1876 deed conveying the rail line states that its purpose is "for the right of way and the use and purpose of the construction of the Railway of said Company, and the use and purpose of the track and roadway of said Company." This broad language is not limited to mainline or common-carrier service, and the current use of the line by CSX and the grain shipper for loading, unloading, and storing cars on the track falls within the scope of the easement. Moreover, as CSX correctly points out, both *Lewellen* and *Howard* dealt with reversionary property interests after all railroad operations had ceased and the tracks had been completely abandoned. *See Lewellen*, 666 N.E.2d at 960; *Howard*, 964 N.E.2d at 780. In contrast, the parties in our case agree that CSX has continued to use the track since ending common-carrier service.

As CSX has not lost its easement, and the declaratory judgment was limited to determining the nature of CSX's and the class members' property interests, the Wedemeyers' state-law claims are not contractual in nature. Because the Wedemeyers seek to control (terminate) use of the track in question through their lawsuit, their claims are preempted under the ICCTA. *See, e.g.*, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("[State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959))); *Thomas Tubbs, Tr. of the Thomas Tubbs Revocable Trust & Individually, & Dana Lynn*

*Tubbs, Tr. of the Dana Lynn Tubbs Revocable Trust & Individually—Petition for Declaratory Order*, FD 35792, 2014 WL 5508153, at \*4 (S.T.B. Oct. 29, 2014) ("damages awarded under state tort laws can manage or regulate a railroad as effectively as the application of any other type of state statute or regulation"); *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1146 (8th Cir. 2015) (holding that ICCTA preempted state-law tort claims, including trespass claim, that burdened rail transportation); *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1070 (11th Cir. 2010) ("The ICCTA expressly preempts state remedies involving the operation of the side track. Therefore, we will not permit landowners to circumvent that Congressional decision through state law nuisance claims.").

The Wedemeyers attempt one more dodge of the ICCTA. They cite to *The Atchison, Topeka & Santa Fe Ry. Co.—Abandonment Exemption—in Lyon Cty., KS*, No. AB-52, 1991 WL 120344 (I.C.C. June 11, 1991), for the proposition that upon CSX's abandonment of the track, the track was no longer "a rail line," regardless of whether it was still in active use or not, and thus fell outside of the STB's jurisdiction. The Wedemeyers did not make this argument in their opening brief, and thus it is forfeited. *See, e.g.*, *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006) (arguments raised for the first time in reply briefs are waived).[8]

---

[8] Moreover, § 32-23-11-6(b) of the Indiana Code provides, "A right-of-way is not considered abandoned if: (1) rail service continues on the right-of-way; or (2) the railroad has entered into an agreement preserving rail service on the right-of-way." Ind. Code. § 32-23-11-6(b). CSX's lease agreement with the grain shipper and the resultant continued use of the track for storage, loading, and so forth, satisfies both provisions of § 32-23-11-6(b), which the Wedemeyers fail to address. Numerous cases also clarify

Because the Wedemeyers seek to eject CSX from land with active, ongoing rail operations, preemption obtains. While the Wedemeyers may present their case before the Surface Transportation Board, they cannot do so here. Consequently, we need not address the merits of CSX's additional and alternative arguments based on the statute of limitations or equitable doctrines.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.

---

that only complete abandonment (that is, cessation of operations) results in a track segment no longer being a rail line. *See, e.g.*, *Common Carrier Status of States, State Agencies & Instrumentalities, & Political Subdivisions*, 363 I.C.C. 132, 135, 135 n.2 (I.C.C. 1980) (explaining that "[w]hen a rail line has been fully abandoned, it is no longer [a] rail line," but also that a line is only "fully abandoned after … [among other things] operations have ceased"); *Birt v. Surface Transp. Bd.*, 90 F.3d 580, 585 (D.C. Cir. 1996) ("several concrete actions … may indicate an intent to abandon," including "cessation of operations," "salvage of the track and track materials," or "relinquishment of control over the right-of-way") (citation omitted). And we have held that auxiliary tracks still in operation remain within the STB's exclusive jurisdiction. *See United Transp. Union-Ill. Legislative Bd. v. Surface Transp. Bd.*, 183 F.3d 606, 612 (7th Cir. 1999) ("transactions involving spur track do not call for the [STB's] authorization … but the Board nonetheless retains exclusive jurisdiction under § 10501(b)(2)").