SCHELLHAS, Judge
In this certiorari appeal, relator-railroad challenges a decision made by respondent Minnesota Public Utilities Commission allowing respondent-utility to proceed with a crossing application submitted to relator *581 under Minn. Stat. § 237.045. Because we reject relator's constitutional challenges to section 237.045 and conclude that the statute applies to respondent-utility's crossing application, we affirm the commission's decision.
FACTS
In May 2014, respondent Qwest Corporation d/b/a CenturyLink QC (CenturyLink) submitted an application to relator BNSF Railway Company (BNSF) to lay underground line that would run for 206 feet roughly parallel to BNSF's tracks in St. Louis Park (the proposed line). The proposed line would provide telecommunications services to a radio station, replacing an older line that had malfunctioned. In the interim, CenturyLink had installed a temporary, above-ground line to service the radio station, but that cable had been cut on several occasions, requiring emergency repairs. In response to CenturyLink's application, BNSF provided a proposed "wire crossing agreement" that included a "license fee" of $27,000. Thereafter, the parties unsuccessfully attempted to negotiate a mutually agreeable fee.
In December 2015, CenturyLink filed a request with the Minnesota Department of Commerce (MnDOC) under Minn. Stat. § 237.04 (2016) for a determination of the just and reasonable compensation it should pay BNSF for the proposed line. BNSF objected to the request, and MnDOC initiated contested-case proceedings in March 2016. Then, following the legislature's adoption of a new statute, Minn. Stat. § 237.045, CenturyLink rescinded its request to MnDOC and moved to dismiss the contested-case proceedings. Over BNSF's objection, MnDOC adopted the recommendation of the administrative-law judge (ALJ) to grant the motion to dismiss.
In June 2017, CenturyLink submitted a new application to BNSF under section 237.045. BNSF objected to the application, asserting that the new statute does not apply to the proposed line, that the statute is unconstitutional because it permits an uncompensated taking, and that the statute is preempted by 49 U.S.C. § 10501. CenturyLink then filed a petition for resolution of the dispute with respondent Minnesota Public Utilities Commission (MPUC). Following a public-comment period, the MPUC issued an order concluding that section 237.045 applies to the proposed line and declining to address BNSF's constitutional issues. BNSF sought reconsideration, which the MPUC denied.
BNSF appeals.
ISSUES
I. Does Minn. Stat. § 237.045 violate the takings clause?
II. Is Minn. Stat. § 237.045 preempted by 49 U.S.C. § 10501 ?
III. Does Minn. Stat. § 237.045 apply to CenturyLink's proposed paralleling?
ANALYSIS
The MPUC's decision under Minn. Stat. § 237.045 is appealable under the Minnesota Administrative Procedure Act (MAPA) and Minn. Stat. § 216B.27 (2016). Minn. Stat. § 237.045, subd. 8. Under MAPA's standard of review, this court may reverse or modify an agency's decision if, among other grounds, it is "in violation of constitutional provisions" or "affected by other error of law." Minn. Stat. § 14.69(a), (d) (2016). On appeal, BNSF argues that Minn. Stat. § 237.045 permits an unconstitutional taking without just compensation; that the statute is preempted by 49 U.S.C. § 10501 ; and that the MPUC erred by determining that the *582 statute applies to CenturyLink's proposed line.
We begin with an overview of the history and structure of Minn. Stat. §§ 237.04, .045. In Minnesota, utilities are authorized to exercise the power of eminent domain, allowing them to lay pipes, cables, or other lines in railroad rights of way, upon "making just compensation therefor" and subject "to the right of the railway company to use its right-of-way and lands for railway purposes." Minn. Stat. §§ 117.025, subd. 10, 222.36 (2016). Since 1998 for crossings and 2001 for parallelings, utilities have had an administrative avenue-under Minn. Stat. § 237.04 -to challenge fees sought by railroads. See Minn. Stat. § 237.04(b) (establishing administrative review process for crossing fees); 1997 Minn. Laws ch. 123, § 1, at 831 (adopting subpart b of the statute); 2001 Minn. Laws 1st Spec. Sess. ch. 8, art. 2, § 61, at 2006 (amending subpart b to govern parallelings).[1]
Under section 237.04, which remains in effect, MnDOC may, upon the request of a utility, determine the just and reasonable charge, based on diminution in land value, that a railroad may charge for a crossing or paralleling of a railroad right-of-way by a cable or line. Minn. Stat. § 237.04(b). A utility may immediately commence construction after filing the request with MnDOC, unless the railroad "asserts in writing that the proposed crossing or paralleling is a serious threat to the safe operations of the railroad or the current use of the railroad right-of-way." Id. (d). Although section 237.04 allows a utility to request MnDOC to determine a just and reasonable charge based on diminution in value of the railroad's land, the statute also expressly preserves the option of a utility to initiate condemnation proceedings under Minn. Stat. §§ 117.012 -.57 (2016) (chapter 117), instead of proceeding before MnDOC. Id.
In May 2016, the legislature adopted Minn. Stat. § 237.045. This new statute applies to crossings in existence before July 1, 2016, if agreements concerning those crossings have expired or been terminated, and to "any crossing commenced on or after July 1, 2016." Minn. Stat. § 237.045, subd. 2.
Under section 237.045, utilities seeking to construct certain facilities[2] in railroad right-of-ways may submit an application to the railroad, including an engineering design, a certificate of insurance, and a "standard crossing fee" of $1,250. Id. , subds. 3, 6, 7. The standard crossing fee is "paid in lieu of any license, permit, application, processing fee, or any other fee or charge to reimburse the railroad for direct expenses incurred by the railroad as a result of the crossing." Id. , subd. 6. The utility may begin construction of the facility 35 days after submitting a completed application, "unless the railroad notifies the utility in writing that the proposed crossing or paralleling is a serious threat to the safe operations of the railroad or to the current use of the railroad right-of-way." Id. , subd. 5. If the railroad objects *583 on those grounds and the parties are unable to resolve the dispute, either party may petition the MPUC for an order resolving the dispute. Id. , subd. 8.
Unlike section 237.04, section 237.045 does not expressly provide a procedure for determining any diminution in value to the railroad's land that will be caused by construction of a facility. But the new statute provides that "[a] utility may elect to undertake a crossing or paralleling under this section or section 237.04" and that "[n]othing in this section impairs the authority of a utility to secure crossing rights by easement through exercise of the power of eminent domain." Id. , subd. 11.
I.
BNSF first argues that the standard crossing fee authorized by Minn. Stat. § 237.045, subd. 6, violates the takings clauses of the United States and Minnesota Constitutions because it allows utilities to take railroad property without providing a process for railroads to obtain just compensation for the taking. See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City , 473 U.S. 172, 194, 105 S.Ct. 3108, 3120, 87 L.Ed.2d 126 (1985) (requiring that "reasonable, certain and adequate provision for obtaining compensation exist at the time of [a] taking" (quotation omitted) ); Loretto v. Teleprompter Manhattan CATV Corp. , 458 U.S. 419, 420, 102 S.Ct. 3164, 3168, 73 L.Ed.2d 868 (1982) (holding that permanent physical occupation of property authorized by government is a taking); see also Nolan & Nolan v. City of Eagan , 673 N.W.2d 487, 492 (Minn. App. 2003) ("The Minnesota Constitution requires the government to compensate a property owner when it takes the owner's property."), review denied (Minn. Mar. 16, 2004). The MPUC responds that the statute is not unconstitutional because the standard crossing fee is unrelated to just compensation for any taking and section 237.045 does not preclude the utility from initiating condemnation proceedings or the railroad from seeking inverse condemnation. We agree.
Minn. Stat. § 237.045, subd. 6, provides that the standard crossing fee is "in lieu of any license, permit, application processing fee, or any other fee or charge to reimburse the railroad for direct expenses incurred by the railroad as a result of the crossing." (Emphasis added.) And Minn. Stat. 237.045, subd. 11, provides that the statute does not preclude eminent-domain proceedings. Accordingly, the standard crossing fee does not represent a determination of just compensation for any taking, and that issue can be addressed in condemnation proceedings if necessary.
CenturyLink and amici resist the conclusion that the standard crossing fee is unrelated to just compensation. They instead assert that Minn. Stat. § 237.045 is constitutional because the diminution in value caused by cable and wire crossings is de minimus and, to the extent that it is not covered by the $1,250 standard crossing fee, the utility may seek just compensation as an "additional requirement" subject to the MPUC's review under Minn. Stat. § 237.045, subd. 9, or seek a determination of just and reasonable compensation from MnDOC under Minn. Stat. § 237.04. We disagree.
The assertion that Minn. Stat. § 237.045, subd. 9, authorizes a just-compensation determination finds no support in the statute. Importantly, subdivision 6, which provides for the standard crossing fee, provides that "[n]o other fee or charge may be assessed to the utility by the railroad." Minn. Stat. § 237.045, subd. 6. Subdivision 9(a) provides that, "[i]f a railroad imposes additional requirements on a utility for crossing its lines, other than the proposed *584 crossing being a serious threat to the safe operations of the railroad or to the current use of the railroad right-of-way, the utility may object to one or more of the requirements." Id. , subd. 4(a). The balance of subdivision 9 provides for proceedings before the MPUC to determine whether "special circumstances exist that necessitate additional requirements for the placement of the crossing." Id. , subd. 9(c). When read in context of the entire statute, it is not reasonable to conclude that the additional requirements contemplated by subdivision 9 include an additional charge , expressly prohibited by subdivision 6, representing any diminution in value to the railroad property. This is particularly evident when the language of section 237.045 is compared to the clear language in Minn. Stat. § 237.04(b) authorizing MnDOC to make a just-compensation determination based on diminution in value in proceedings under that statute.
The assertion that Minn. Stat. § 237.04 provides an avenue for a railroad to seek just compensation based on diminution in value is also unpersuasive. Minnesota Statutes section 237.04(b) authorizes MnDOC to determine a just and reasonable charge upon request of a utility , but does not authorize railroads to initiate proceedings seeking a just-compensation determination. A railroad can submit a complaint to MnDOC under Minn. Stat. § 237.04(a)"claiming to be injuriously affected or subjected to hazard by any crossing or paralleling of the lines of any railroad" in response to which MnDOC "shall after a hearing, make such order and prescribe such terms and conditions for the construction, maintenance, and operation of the lines in question as may be just and reasonable." Minn. Stat. § 237.04(a). But construing subpart (a) to allow for a just-compensation determination would render subpart (b) superfluous. See Am. Family Ins. Grp. v. Schroedl , 616 N.W.2d 273, 277 (Minn. 2000) ("A statute should be interpreted, whenever possible, to give effect to all of its provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." (quotation omitted) ). In this regard, we note that subpart (b) was added to the statute in 1997. See 1997 Minn. Laws ch. 123, § 1, at 831 (adopting subpart (b) ). If just compensation could already be determined under subpart (a), it would have been unnecessary for the legislature to add subpart (b). See Auto Owners Ins. Co. v. Perry , 749 N.W.2d 324, 328 (Minn. 2008) (noting court's "presumption that the adoption of an amendment is indicative of legislative intent to effect some change in the existing law" (quotation omitted) ).
CenturyLink also asserts that the language in Minn. Stat. § 237.045, subd. 6, providing for application of the standard crossing fee "[u]nless ... determined under section 237.04," authorizes a railroad to seek a just-compensation determination under Minn. Stat. § 237.04. But as we note above, a railroad is not authorized to initiate just-compensation proceedings under section 237.04(b). Accordingly, we conclude that the language in Minn. Stat. § 237.045, subd. 6, simply provides that the standard crossing fee need not be paid in circumstances where a utility elects to proceed under Minn. Stat. § 237.04(b).
In sum, we conclude that Minn. Stat. § 237.045 does not violate the takings clauses because it does not preclude condemnation proceedings to determine just compensation for any diminution in value caused by any taking resulting from a crossing or paralleling of a railroad's right of way. If a utility proceeds with a crossing or paralleling under section 237.045 without initiating eminent-domain proceedings under chapter 117, a railroad will have no adequate remedy other than inverse condemnation for seeking to recover any diminution *585 in value caused by any taking as a result of the crossing or paralleling.
II.
BNSF next argues that Minn. Stat. § 237.045 is preempted by the federal Interstate Commerce Commission Termination Act (ICCTA).[3] The ICCTA includes "a broadly worded preemption provision," 49 U.S.C. § 10501(b),[4] to "further the goal of limited state regulation of interstate rail transportation." City of Ozark v. Union Pacific R.R. , 843 F.3d 1167, 1170 (8th Cir. 2016). The Surface Transportation Board (STB) and federal courts have treated state regulations in three categories for purposes of determining ICCTA preemption, the first two of which are per se preempted, and the third of which is subject to an "as applied" analysis to determine preemption. Id. at 1171. The per se preemption categories are: (1) "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations"; and (2) "state or local regulation of matters directly regulated by the [STB]-such as construction, operation, and abandonment of rail lines." Id. (quoting CSX Transp., Inc. , -Pet. for Declaratory Order , No. 34662, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005) ). The "as applied" preemption category encompasses those "state or local actions that are not facially preempted," for which "the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation." Id. (quoting CSX Transp., Inc. , 2005 WL 1024490, at *2-3 ).
The STB has rejected the argument that ICCTA preempts any exercise of eminent domain with respect to railroad property. Maumee & W. R.R. & RMW Ventures, LLC-Pet. for Declaratory Order , No. 34354, 2004 WL 395835, at *2 (S.T.B. Mar. 2, 2004). The STB explained that "routine, non-conflicting uses, such as non-exclusive easements for at-grade road crossings, wire crossings, sewer crossings, etc., are not preempted so long as they would not impede rail operations or pose undue safety risks." Id. Accordingly, most federal courts have used an "as applied" analysis to determine whether particular exercises of eminent domain are preempted by ICCTA. See, e.g. , Union Pacific R.R. v. Chicago Transit Auth. , 647 F.3d 675, 680-81 (7th Cir. 2011) (using "as applied" analysis to determine whether condemnation of 2.8-mile portion of right-of-way for local rail service was preempted by ICCTA); Jay M. Zitter, *586 Preemptive Effect of Interstate Commerce Commission Termination Act (ICCTA) , 2 A.L.R. Fed. 3d Art. 3 (2015) (collecting cases). As the Seventh Circuit explained in Union Pacific :
We believe, however, that for the condemnation case before us, an "as applied" analysis is more appropriate than an analysis for categorical preemption. A condemnation is a peculiar type of regulation, one specifically limited in scope to the ownership or use of one particular piece of property. When considering a standard regulation-which is normally a rule of general applicability-using [STB]'s framework for both a categorical analysis and an "as applied" analysis makes sense: the regulation may be categorically preempted on its face, or based on the specific facts of the case it may be preempted "as applied" due to its effect on railroad transportation. By contrast, a condemnation is not a rule of general applicability because each instance necessarily varies with the facts of the case and the specific property subject to the condemnation.
647 F.3d at 679-80.
Like eminent-domain statutes, Minn. Stat. § 237.045 is not a standard regulation that itself may be preempted or not. Instead, the statute applies to routine crossings that even BNSF may concede are not preempted by the ICCTA. But it also applies to more extraordinary crossings and parallelings that may interfere with railroad operations or impose undue safety risks and therefore can be preempted. Accordingly, we reject BNSF's argument that Minn. Stat. § 237.045 is per se preempted by the ICCTA.
BNSF suggests that Minn. Stat. § 237.045 is also preempted under an as-applied analysis. But it does not undertake any analysis to explain how the application of Minn. Stat. § 237.045 in this case-to allow CenturyLink to lay 206 feet of line under BNSF's right-of-way-impedes rail operations or poses an undue safety risk. Indeed, Minn. Stat. § 237.045 allowed BNSF to object to the proposed line "due to the proposal being a serious threat to the safe operations of the railroad or to the current use of the railroad right-of-way," and BNSF made no such objection. Accordingly, we conclude that BNSF has not demonstrated that the application of Minn. Stat. § 237.045 in this case is preempted by the ICCTA under an as-applied analysis. See Williams v. Nat'l Football League , 582 F.3d 863, 880 (8th Cir. 2009) (stating that party asserting preemption bears burden of persuasion); see also Schoepke v. Alexander Smith & Sons Carpet Co ., 290 Minn. 518, 187 N.W.2d 133, 135 (1971) (holding that assignment of error based on "mere assertion and not supported by any argument or authorities" is waived "unless prejudicial error is obvious on mere inspection").[5]
III.
BNSF finally argues that the MPUC erred by interpreting Minn. Stat. § 237.045 to apply to the paralleling sought by CenturyLink in this case. "When a decision turns on the meaning of words in a statute or regulation, a legal question is presented. In considering such questions of law, reviewing courts are not bound by the decision of the agency and need not defer to agency expertise." St. Otto's Home v. Minn. Dep't of Human Servs ., 437 N.W.2d 35, 39-40 (Minn. 1989) (citations omitted); see also *587 In re Denial of Eller Media Co.'s Applications for Outdoor Adver. Device Permits , 664 N.W.2d 1, 7 (Minn. 2003) (explaining that court "retain[s] the authority to review de novo errors of law which arise when an agency decision is based upon the meaning of words in a statute").[6] BNSF asserts that section 237.045 does not apply to the proposed line for two reasons, neither of which is persuasive.
BNSF first asserts that Minn. Stat. § 237.045 does not apply to parallelings because (a) the statute specifies its application to "crossings," (b) the statute defines a crossing to exclude a longitudinal occupancy, and (c) a paralleling is a longitudinal occupancy. See Minn. Stat. § 237.045, subds. 1(b) (defining crossing), 2 (providing for application of statute to crossings); see also id. , subd. 3(b)-(c) (requiring completion of crossing application and payment of standard crossing fee).
Section 237.045 broadly defines a "crossing" as "a utility facility constructed over, under, or across a railroad right-of-way," but excludes from that definition "longitudinal occupancy of railroad right-of-way." Id. , subd. 1(b). The statute does not define longitudinal occupancy, but it does define a "paralleling" as "a utility facility that runs adjacent to and alongside the lines of a railroad for no more than one mile ..., after which the utility facility crosses the railroad lines, terminates, or exits the railroad right-of-way." Id. , subd. 1(d). And the statute provides that "[a] utility may elect to undertake a crossing or paralleling under this section or section 237.04." Id. , subd. 11 (emphasis added). As the MPUC observed, the statute also uses the phrase "crossing or paralleling" in several other subdivisions of the statute. See, e.g., id. , subds. 2(b) (statute does not apply to "a crossing or paralleling of a large energy facility"), 5 (allowing utility to commence construction of "the proposed crossing or paralleling" 35 days after completed application, absent objection), 8 (requiring railroad to give written notice of objection to "proposed crossing or paralleling").
Interpreting the statute as BNSF advocates would render the portions of the statute addressing parallelings superfluous. This court can only give effect to all the provisions of the statute by holding that parallelings are distinct from longitudinal occupancies and fall within the category of crossings that are subject to the application and fee provisions of the statute. See Schroedl , 616 N.W.2d at 277 (holding that statute should be interpreted to give effect to all of its provisions and that court must "read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations").
BNSF argues that the legislative history supports a conclusion that the statute was not intended to apply to parallelings. In the absence of ambiguity, we do not consider legislative history in interpreting statutes. State v. Struzyk , 869 N.W.2d 280, 288 n.5 (Minn. 2015). We note, however, that the legislative history is consistent with our interpretation. The Minnesota House and Senate started at different positions on whether to include longitudinal occupancies in the new statute-the house excluding and the senate including. H.F. 963 (as introduced Feb. 16, 2015); S.F. 877 (as introduced Feb. 16, 2015). But both bills were subsequently amended to add the definition of, and references *588 to, "parallelings." S.F. 877, first engrossment; H.F. 963, first engrossment. BNSF correctly recounts that longitudinal occupancies were first included in, but later excluded from, the senate bill that was ultimately passed into law, but BNSF disregards the amendments addressed to parallelings. See S.F. 877, fifth engrossment (stating that " 'crossing' ... does not include longitudinal occupancy"). Were we to consider the legislative history, we would conclude that the parallelings language in the Minnesota statute reflects a legislative compromise-consistent with our contextual reading of the plain language of the statute-to apply Minn. Stat. § 237.045 to parallelings but not to other longitudinal occupancies.
BNSF also asserts that, even if Minn. Stat. § 237.045 applies to parallelings generally, it does not apply to the particular paralleling sought by CenturyLink because it is not a "crossing commenced on or after July 1, 2016." BNSF supports this argument on the fact that CenturyLink laid an above-ground line over BNSF's land to temporarily serve the same radio station that will be served by the proposed line, implying that the proposed line wire will be a part of the same crossing as the above-ground line. We reject this argument. The statute defines both a "crossing" and a "paralleling" as a "facility" and defines a "facility" as "any item of personal property placed over, across, or underground" including a cable or wire. Minn. Stat. § 237.04, subd. 1 (b), (c), (d) (emphasis added). The proposed line is a separate item from the above-ground temporary line that CenturyLink laid in the interim. It therefore is a separate facility and a separate paralleling that had not been constructed at the time of CenturyLink's application.
DECISION
Proceedings under Minn. Stat. § 237.045 do not effect an unconstitutional taking, and the statute is not per se preempted by 49 U.S.C. § 10501, nor has BNSF demonstrated preemption under an as-applied analysis. In addition, the MPUC did not err in interpreting the statute to apply to CenturyLink's proposed line. Accordingly, we affirm the MPUC's decision.[7]
Affirmed; motion denied.

Section 237.04 defines "paralleling" to mean "that the relevant utility facilities run adjacent to and alongside the lines of a railroad for not more than one mile, or another distance agreed to by the parties, before the utility facilities cross the railroad lines, terminate, or exit the railroad right-of-way." Minn. Stat. § 237.04(d).

A "facility" is "any item of personal property placed over, across or underground for use in connection with the storage or conveyance of," inter alia, cable television and includes without limitation cables, lines, and wires. Minn. Stat. § 237.045, subd. 1(c). As we address in section III, the parties dispute whether the new statute applies to parallelings or only crossings.

See Pub. Law 104-88 109 Stat. 804 (codified in scattered sections of 5, 7, 11, 15, 16, 18, 23, 26, 28, 29, 31, 33, 39, 42, 45, 49, and 52 U.S.C.).

The preemption provision provides:
The jurisdiction of the Surface Transportation Board over-
(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.
49 U.S.C. § 10501(b). "Transportation" is broadly defined to include "property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9) (2012).

Our holding under an as-applied analysis is necessarily limited to the facts and arguments presented in this appeal. We do not hold that Minn. Stat. § 237.045 could never be preempted in its application.

An exception applies when a statute is ambiguous. See A.A.A. v. Minn. Dep't of Human Servs ., 832 N.W.2d 816, 823 (Minn. 2013) ("[W]hen a statute is ambiguous, we give deference to the administrative interpretation of the relevant statute by a state agency if the agency is charged with the responsibility of applying the statute on a statewide basis and its interpretation is reasonable."). Here, there is no argument of statutory ambiguity.

Relator filed a motion to strike an addendum filed by amicus Northern States Power Company d/b/a Xcel Energy (Xcel) and portions of the briefs filed by Xcel and a group of amici service-provider associations. Relator argues that the briefs and addendum include information outside the record and are cumulative of CenturyLink's brief. Because we have disregarded materials that are not properly part of the record and conclude that the arguments made by amici add some useful insights, we deny relator's motion. See Drewitz v. Motorwerks, Inc ., 728 N.W.2d 231, 233 n.2 (Minn. 2007) (denying as moot motion to strike portions of briefs that the court did not consider in deciding appeal); Breza v. City of Minnetrista , 706 N.W.2d 512, 515 n.1 (Minn. App. 2005) (denying motion to strike amicus brief that provided some useful insights), aff'd , 725 N.W.2d 106 (Minn. 2006).