2020 IL App (1st) 190098

No. 1-19-0098

Opinion filed June 25, 2020

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| BURGOYNE, LLC, an Illinois Limited Liability Company, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| CHICAGO TERMINAL RAILROAD COMPANY, an Illinois Corporation, and IOWA PACIFIC HOLDINGS, LLC, an Illinois Limited Liability Company, | ) ) ) ) ) | No. 17 CH 6199 |
| Defendants-Appellees | ) ) | |
| (The City of Chicago, a Municipal Corporation, | ) ) | Honorable Pamela McLean Meyerson, |
| Intervenor-Appellee). | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    This appeal arises from a dispute between a rail carrier and the owner of land over which

the rail carrier held an easement to operate its rail line. Contending that the easement terminated

due to nonuse, the landowner, Burgoyne, LLC (Burgoyne), sued the rail carrier, Chicago Terminal

Railroad Company, and its parent company, Iowa Pacific Holdings, LLC (which we will collectively call CTR), to enforce its reversionary interest in the property. While the case was pending, CTR received permission from the federal agency that oversees rail transportation to transfer its right-of-way to the City of Chicago (City) for use as a recreational trail. The City then intervened and both it and CTR filed motions to dismiss Burgoyne's suit as preempted under federal law. The circuit court granted the motions, and Burgoyne now appeals. For the reasons that follow, we affirm.[1]

¶ 2                                    I. BACKGROUND

¶ 3                               A. Statutory Background

¶ 4      This case concerns the preemptive effect of two federal statutes: the ICC Termination Act of 1995 (ICCTA) (codified at 49 U.S.C. § 10101 *et seq.*) and the National Trails System Act (Trails Act) (codified at 16 U.S.C. § 1241 *et seq.*). The ICCTA vests the United States Surface Transportation Board (STB or Board) with exclusive jurisdiction over "transportation by rail carriers" and the "abandonment" of rail lines. 49 U.S.C. § 10501(b) (2018). "[T]he remedies provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.*

¶ 5      Under the ICCTA, a rail carrier may abandon a rail line "only if the Board finds that the present or future public convenience and necessity require or permit the abandonment." 49 U.S.C. § 10903(d) (2018). An application for authorization to abandon a line may be filed by either the rail carrier or an interested third party, such as an adjacent landowner with a claim to a reversionary

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

interest in the railroad's right-of-way. *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 145 (1946); *City of South Bend v. Surface Transportation Board*, 566 F.3d 1166, 1168 (D.C. Cir. 2009); see *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 8 (1990) (explaining that "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests" that "revert[ ] to the abutting landowner upon abandonment of rail operations"). An application filed by a third party is called an application for adverse abandonment. *Howard v. Surface Transportation Board*, 389 F.3d 259, 261 (1st Cir. 2004). If the Board determines that the public convenience and necessity support abandonment, it may either "approve the application as filed" or "approve the application with modifications and require compliance with conditions that [it] finds are required by public convenience and necessity." 49 U.S.C. § 10903(e)(1). The Board maintains jurisdiction over a rail line, and the line remains part of the national rail network, until the Board issues an unconditioned certificate of abandonment (*Hayfield Northern R.R. Co. v. Chicago & North Western Transportation Co.*, 467 U.S. 622, 633 (1984)) and the rail carrier notifies the Board that it has consummated the abandonment (49 C.F.R. § 1152.29(e)(2) (2019)).

¶ 6    The second federal statute at issue, the Trails Act, was enacted to create a national system of recreational trails. See 16 U.S.C. § 1241 (2018). Congress amended the Trails Act in 1983 (see Pub. L. 98-11, § 208, 97 Stat. 42, 48) to allow for unused railroad rights-of-way to be converted to recreational trails on an interim basis as an alternative to abandonment. See 16 U.S.C. § 1247(d) (2018). The purpose of the amendment was to promote the development of recreational trails while preserving established rail corridors for possible future reactivation of rail service. *Preseault*, 494 U.S. at 17-18. To that end, when an abandonment application is filed, a state, local government, or private organization acting as a "trail sponsor" may submit a request to use the right-of-way for

interim trail use. 49 C.F.R. § 1152.29(a). The trail sponsor must be willing to assume responsibility for the right-of-way and acknowledge that its interim trail use will be subject to possible future reactivation of the right-of-way for rail service. 49 C.F.R. § 1152.29(a)(2), (3). If the rail carrier is willing to negotiate a trail use agreement, and the conditions for abandonment are otherwise satisfied, the STB will issue a certificate of interim trail use or abandonment (CITU), allowing the parties to negotiate an interim trail use agreement. 49 C.F.R. § 1152.29(b)(1)(ii). If the parties are unable to reach an agreement on interim trail use, the rail carrier will then be authorized to abandon the line. See *Preseault*, 494 U.S. at 7 & n.5.

¶ 7     If the rail carrier and trail sponsor do come to an agreement, the rail carrier may transfer the right-of-way to the trail sponsor for interim trail use, "subject to restoration or reconstruction for railroad purposes." 16 U.S.C. § 1247(d); see *Preseault*, 494 U.S. at 7. As noted above, railroads often hold their rights-of-way under easements that are limited to use for railroad purposes. *Preseault*, 494 U.S. at 8. The terms of these easements (and state property law) frequently "provide that the property reverts to the abutting landowner upon abandonment of rail operations." *Id.* If rails-to-trails conversions were to trigger such reversionary interests, however, it would largely impede the Trails Act's dual goals of creating recreational trails and preserving established rail corridors for future reactivation of rail service. To address these problems, the Trails Act (as amended) provides that interim trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). In other words, when a right-of-way held under a limited-use easement is transferred for interim trail use, the Trails Act "prevent[s] property interests [in the right-of-way] from reverting under state law." *Preseault*, 494 U.S. at 8. In such cases, the Trails Act effects a taking

of the abutting landowner's reversionary interest, for which it may seek just compensation in the United States Court of Federal Claims. *Id.* at 11-12.

¶ 8                                     B. Factual and Procedural History

¶ 9     Burgoyne owns a parcel of land near the site of the planned Lincoln Yards development in Chicago. The property is bounded by North Avenue to the south, Kingsbury Street to the northeast, and the North Branch of the Chicago River to the west. A single, mainline railroad track extends across a portion of the property. The track is part of a larger rail line spanning approximately 2.875 miles, which originates northwest of the property, at Union Pacific's North Avenue Yard, and proceeds east and south to a terminus at the southern end of Goose Island, south of the property.

¶ 10     Burgoyne purchased the property in 2000 from CMC Real Estate Corporation (CMC). In 1987, CMC granted an easement across the property for railroad purposes to Soo Line Railroad Company (Soo Line). The corrective deed conveying the easement provided that the easement would terminate automatically if it was not used in the active operation of a railroad for 12 consecutive months. The deed further provided that, upon termination of the easement, Soo Line would remove the tracks and other railroad equipment from the property and execute documentation to evidence the easement's termination. The deed was issued under the supervision of the federal bankruptcy court overseeing the railroad reorganization proceedings for CMC's predecessor-in-interest, the Chicago, Milwaukee, St. Paul and Pacific Railroad Company. In 2006, CTR acquired Soo Line's interest in the rail line at issue, including the easement across Burgoyne's property.

¶ 11     In August 2016, Burgoyne notified CTR that the easement had terminated because it had not been used in active railroad operations for 12 consecutive months. Burgoyne instructed CTR

to remove the tracks and other railroad equipment from the property and reserved its right to request that CTR execute documentation evidencing the termination. CTR disputed that the easement had terminated and refused to remove its tracks and other equipment from the property. Burgoyne responded by erecting a fence around the property and across the tracks.

¶ 12     On two occasions in April 2017, CTR entered Burgoyne's property and cut down the fence. Each time, Burgoyne reinstalled the fence. After the second such incident, Burgoyne commenced the present action in the circuit court, alleging that the easement across its property had terminated under the terms of the corrective deed. Burgoyne's complaint sought to enjoin CTR from further damaging or removing its fencing. It also sought an order directing CTR to remove the railroad tracks from the property and seek and obtain any authorization required to effectuate the easement's termination. In addition, Burgoyne requested monetary damages for CTR's alleged breach of the corrective deed and for CTR's destruction of its fencing.

¶ 13     CTR moved to dismiss the complaint under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2016)), asserting that Burgoyne's claims were preempted by the ICCTA. CTR argued that, because the STB has exclusive jurisdiction over the abandonment of rail lines, the circuit court lacked jurisdiction to grant Burgoyne's requested relief, which would effectively cause an unauthorized abandonment of CTR's rail line. In response, Burgoyne acknowledged that the STB had exclusive jurisdiction over the abandonment of rail lines, but it insisted that its claims did not implicate any issue of abandonment. Rather, Burgoyne argued, its claims rested on state property and contract law, the enforcement of which did not constitute regulation within the STB's exclusive jurisdiction.

¶ 14    In June 2017, while the motion to dismiss was pending, Alloy Property Company (Alloy), which owns land to the north of Burgoyne's property that is also traversed by CTR's rail line, filed a petition with the STB indicating its intent to file an application for adverse abandonment of the rail line and requesting a waiver of certain regulations. In September 2017, after the STB granted its waiver request, Alloy filed a notice of intent to file an adverse abandonment application, which it formally filed in October 2017. Over Burgoyne's objection, the circuit court stayed the present action until the STB issued a decision on Alloy's adverse abandonment application. We affirmed the stay order on appeal. *Burgoyne, L.L.C. v. Chicago Terminal R.R. Co.*, 2018 IL App (1st) 172500-U.

¶ 15    In January 2018, CTR notified the STB that it would not oppose Alloy's application and agreed that the public convenience and necessity supported abandonment of its line. The City then filed a request for interim trail use, stating that it was willing to assume responsibility for the right-of-way and acknowledging that any trail use would be subject to possible future reconstruction and reactivation of the right-of-way for rail service. CTR indicated that it was willing to negotiate an interim trail use agreement with the City. Burgoyne then submitted a letter discussing the pending state-court litigation. Burgoyne asserted that CTR had no authority to negotiate an interim trail use agreement for the portion of the rail line that crossed its property because CTR's easement over the property had terminated. Burgoyne thus asked that the STB not to include its property in any CITU.

¶ 16    In April 2018, the STB granted Alloy's application and issued a CITU allowing the City and CTR to negotiate an interim trail use agreement. The order stated that if the City and CTR reached an agreement, interim trail use would be permitted, subject to possible future

reconstruction and reactivation of the right-of-way for rail service. If the parties were unable to reach an agreement, CTR would be authorized to abandon the line. The Board denied Burgoyne's request to exclude its property from the CITU, explaining that it had no discretion to deny a request for interim trail use that satisfied the requirements of the Trails Act and the Board's rules, but it noted that issuance of the CITU was "not intended to address the merits of any pending litigation."

¶ 17    After the STB issued its decision, the circuit court lifted the stay in the present action and granted the City's motion to intervene to protect its interest in the rail corridor. CTR and the City then filed separate motions to dismiss, each arguing that Burgoyne's claims were preempted by the ICCTA and the Trails Act. In December 2018, the circuit court granted the motions to dismiss. The court explained that, because the STB had authorized interim trail use, the Trails Act "precludes [Burgoyne] from arguing that the easement terminated under State contract law" and preempts Burgoyne's claims. The court noted that its decision was without prejudice to any takings claim Burgoyne may bring in the federal court of claims. Burgoyne then filed a timely notice of appeal.[2]

¶ 18                                    II. ANALYSIS

¶ 19    Federal preemption arises from the supremacy clause of the United States Constitution, which provides that federal law "shall be the supreme Law of the Land." U.S. Const., art. VI., cl. 2. Under the supremacy clause, a state law that contradicts or interferes with federal law is

---

[2] While briefing was underway, the City filed a notice with the STB to acquire CTR's right to reactive rail service on the line that is subject to the CITU. See City of Chicago—Acquisition Exemption—Chicago Terminal Railroad, 84 Fed. Reg. 37,944 (Aug. 2, 2019). CTR later assigned to the City its right to resume rail service and its interest in the easement across Burgoyne's property. See Cook County Recorder of Deeds, Online Recordings Search, https://www.ccrecorder.org/recordings/recording/show/130376223 (last visited June 11, 2020) [https://perma.cc/WE6X-WNFH]. The City then notified the STB that it had reached an agreement for interim trail use with CTR.

preempted. *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604 (1991). Federal law may preempt state law either expressly or by implication. *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008). In either case, "[t]he key inquiry *** is to determine the intent of Congress." *Carter v. SSC Odin Operating Co.*, 237 Ill. 2d 30, 40 (2010). Because federal preemption presents a question of law, we review the issue *de novo*. *People v. Williams*, 235 Ill. 2d 178, 186 (2009). We likewise review *de novo* a circuit court's order dismissing an action under section 2-619. *First Midwest Bank v. Cobo*, 2018 IL 123038, ¶ 16.

¶ 20    Congress enacted the ICCTA to abolish the Interstate Commerce Commission (ICC) and transfer its regulatory authority over the rail transportation system to the STB. *Wedemeyer v. CSX Transportation, Inc.*, 850 F.3d 889, 894 (7th Cir. 2017). The ICCTA provides that:

"The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

The ICCTA's predecessor statute, the Interstate Commerce Act, was "among the most pervasive and comprehensive of federal regulatory schemes." *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). The same is true of the ICCTA. Indeed, "Congress's intent in the [ICCTA] to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping." *Union Pacific R.R. Co. v. Chicago Transit Authority*, 647 F.3d 675, 678 (7th Cir. 2011).

¶ 21    As relevant here, the ICCTA endows the STB with exclusive authority to regulate the abandonment of rail lines. See *Chicago & North Western Transportation Co.*, 450 U.S. at 320 (describing the ICC's authority to regulate abandonments under the Interstate Commerce Act as "exclusive" and "plenary"). Under the ICCTA, a rail carrier may not "abandon any part of its railroad lines" unless "the Board finds that the present or future public convenience and necessity require or permit the abandonment." 49 U.S.C. § 10903(d). Unless the Board issues an unconditioned certificate of abandonment for a rail line, the Board retains jurisdiction over the line and the line remains part of the national rail network. See *Hayfield Northern R.R. Co.*, 467 U.S. at 633.

¶ 22    State and local actions may be preempted by the ICCTA either categorically or on an as-applied basis. *Union Pacific R.R. Co.*, 647 F.3d at 679; *CSX Transportation, Inc.*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2-3 (May 3, 2005). As noted, the ICCTA's express preemption clause states that "the remedies provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under *** State law." 49 U.S.C. § 10501(b). By focusing on "regulation," the ICCTA expressly preempts only those state laws that "have the effect of manag[ing] or govern[ing] rail transportation," while allowing

"application of laws having a more remote or incidental effect on rail transportation." (Internal quotation marks omitted.) *Franks Investment Co. v. Union Pacific R.R. Co.*, 593 F.3d 404, 410 (5th Cir. 2010). Thus, "actions by a state or local body [that] would directly conflict with exclusive federal regulation of railroads" are categorically preempted. *CSX Transportation*, 2005 WL 1024490, at *3. Such actions include "any form of state or local permitting or preclearance that *** could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized" and "state or local regulation of matters directly regulated by the Board[,] such as the construction, operation, and abandonment of rail lines." *Id.* at *2.

¶ 23    In addition to those actions that are expressly and categorically preempted, the ICCTA also impliedly preempts, on an as-applied basis, any state or local action that "would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* at *3; see *Union Pacific R.R. Co.*, 647 F.3d at 679. To determine whether an action would prevent or unreasonably interfere with rail transportation, courts must conduct "a factual assessment of the effect of providing the claimed remedy." *PCS Phosphate Co. v. Norfolk Southern Corp.*, 559 F.3d 212, 221 (4th Cir. 2009).

¶ 24    Under these principles, we conclude that Burgoyne's claims are not categorically preempted by the ICCTA, but that they are preempted as applied. With respect to categorical preemption, we note that Burgoyne's claims rest on general principles of state property and contract law that cannot be said to "have the effect of manag[ing] or govern[ing] rail transportation." (Internal quotation marks omitted.) *Franks Investment Co.*, 593 F.3d at 410. Moreover, Burgoyne's claims arise from a "[v]oluntary agreement[ ] between private parties."

*PCS Phosphate Co.*, 559 F.3d at 218. Because such agreements "are not presumptively regulatory acts," they do not "constitute the sort of 'regulation' expressly preempted by the statute." *Id.*

¶ 25 Although not categorically preempted, Burgoyne's claims are preempted as applied due to the effect that the claimed remedies would have on rail transportation. Burgoyne's complaint seeks to force CTR to remove its tracks from the right-of-way and prohibit it from removing a fence that blocks access to its rail line. That relief would make it impossible for CTR to conduct rail service on the line and would effectively result in the line's unauthorized abandonment. It is difficult to see how such relief would not prevent or unreasonably interfere with rail transportation. The same is true of Burgoyne's request for monetary relief, which rests on its contention that CTR has lost the right to access the tracks that cross its property. To prevent CTR from continuing to access and operate its rail line "through an award of damages" would prevent and unreasonably interfere with rail transportation "as effectively" as an award of "preventive relief." (Internal quotation marks omitted.) *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992) (opinion of Stevens, J., joined by Rehnquist, C.J., and White and O'Connor, JJ.).

¶ 26 Burgoyne's complaint also asked the circuit court to order CTR to "seek[ ] and obtain[ ]" authorization to abandon the line. Even assuming that the circuit court could have ordered CTR to seek abandonment authority (a point on which we express no opinion), it certainly could not require the STB to grant such authority. Nor could the circuit court have prevented CTR from negotiating an interim trail use agreement as an alternative to abandonment. Such relief would unreasonably interfere with the STB's exclusive jurisdiction to impose conditions on a rail carrier's abandonment of a rail line (49 U.S.C. § 10903(e)(1)(B)) and conflict with "the national policy to preserve established railroad rights-of-way for future reactivation of rail service" (16 U.S.C.

§ 1247(d)). Indeed, once the STB declined to authorize abandonment and instead issued a CITU, granting Burgoyne's requested relief would have required the circuit court to effectively invalidate the CITU. But Congress has given the federal courts of appeals exclusive jurisdiction over challenges to the Board's decisions. See *Grantwood Village v. Missouri Pacific R.R. Co.*, 95 F.3d 654, 658 (8th Cir. 1996) (citing 28 U.S.C. § 2342(5) (1994)). Burgoyne could have challenged the CITU in the proper federal appeals court, but it cannot do so in the state circuit court.

¶ 27    In its attempt to resist this conclusion, Burgoyne insists that it seeks only to enforce its state law property and contract rights and that its complaint raises no issue of abandonment under the ICCTA. But a party may not avoid the STB's exclusive jurisdiction to regulate abandonments "by mere artful pleading." *Chicago & North Western Transportation Co.*, 450 U.S. at 324. "ICCTA preemption does not depend upon the source of a state law claim" but on the effect "the requested remedy" would have on rail transportation. *City of Ozark v. Union Pacific R.R. Co.*, 843 F.3d 1167, 1172 (8th Cir. 2016). As explained above, granting Burgoyne's requested relief would prevent and unreasonably interfere with rail transportation and conflict with the STB's exclusive jurisdiction over the abandonment of rail lines. For that reason, Burgoyne's claims are preempted by the ICCTA.

¶ 28    Burgoyne argues that enforcement of a voluntary agreement cannot be preempted by the ICCTA because such agreements do not constitute state regulation. But while the ICCTA's express preemption provision is limited to state or local action regulating rail transportation, an implied preemption analysis under the statute is not similarly cabined. The Fourth Circuit's decision in *PCS Phosphate Co.*, on which Burgoyne places great emphasis, demonstrates this point. There, the court held (as noted above) that voluntary agreements between private parties "are not

presumptively regulatory acts" and thus do not "constitute the sort of 'regulation' expressly preempted by the statute." *PCS Phosphate Co.*, 559 F.3d at 218. Nevertheless, the court proceeded to consider whether enforcement of the agreement at issue was impliedly preempted under the particular facts of the case. *Id.* at 220. The court ultimately concluded that the agreement did not unreasonably interfere with rail transportation, but it did not rule out the possibility that enforcement of voluntary agreements could be impliedly preempted under different circumstances. See *id.* at 221-22 ("This is not to say that a voluntary agreement could never constitute an 'unreasonable interference' with rail transportation ***.").

¶ 29    Burgoyne also relies on the Seventh Circuit's *dictum* that "there is no issue of federal preemption" where "a state or local government secures the use of property in a way that affects railroad transportation by contract or other agreement." *Union Pacific R.R. Co.*, 647 F.3d at 682. According to Burgoyne, that statement supports its position that the enforcement of a private contractual agreement is never preempted by the ICCTA. But we find that position impossible to square with *Thompson*, 328 U.S. at 146-49, which held that a private contract could not be used to bypass the ICC's exclusive jurisdiction to regulate abandonment of rail lines. There, one railroad company (Brownsville) contracted to operate its trains over the tracks of another railroad company (Tex-Mex). *Id.* at 136. Tex-Mex later attempted to cancel the agreement under the terms of the contract, but Brownsville continued to use the tracks and refused to pay any additional fees. *Id.* at 137. In reversing a lower court's award of damages, the Supreme Court held that, even "[t]hough the contract [had been] terminated pursuant to its terms, a certificate [of abandonment from the ICC] would still be required" before Brownsville could be forced to stop using the tracks. *Id.* at 145. "Until abandonment is authorized," the Court explained, "operations must continue." *Id.* at

147. The same principle governs here. Even if CTR's easement over Burgoyne's property has terminated under the terms of the corrective deed, CTR may not be forced off the right-of-way and prevented from operating its rail line until the STB has authorized the line's abandonment.

¶ 30    Burgoyne notes that *Thompson* involved a dispute between two rail carriers, while this case pits a rail carrier against a private property owner. That distinction is immaterial. *Thompson* rests on the principle that "rail lines cannot be removed from the national rail system without authorization from the [STB] even if their underlying leases have expired." *Pinelawn Cemetery*, STB Finance Docket No. 35468, 2015 WL 1813674, at *7 (Apr. 21, 2015). As the STB explained in *Pinelawn Cemetery*, the same principle that limits "the authority of a public body to regulate a rail carrier under state and local law" applies to "the rights of a private party to remove a rail carrier under contract law." *Id.* at *9. "Just as state regulatory laws must yield to federal law under [the ICCTA]," the Board explained, "the expiration of a contract between a railroad and a landowner does not, by itself, amount to an abandonment" and cannot be used "to evict the [railroad] from the property." *Id.* Likewise, the termination of a rail carrier's easement under state contract or property law cannot be used to oust the carrier from its right-of-way unless and until the STB has authorized an abandonment of the affected rail line.

¶ 31    Burgoyne next asserts that enforcement of a rail carrier's voluntary agreement can never be deemed to unreasonably interfere with rail transportation. But the cases Burgoyne cites do not support that blanket proposition. While a rail carrier's voluntary agreements should generally "be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce," that presumption does not mean "that a voluntary agreement could never constitute an 'unreasonable interference' with rail

transportation." (Internal quotation marks omitted.) *PCS Phosphate Co.*, 559 F.3d at 221. Thus, when deciding whether the enforcement of a voluntary agreement would unreasonably interfere with rail transportation, a court must consider the details of the agreement at issue and conduct "a factual assessment of the effect of providing the claimed remedy." *Id.*

¶ 32    In *PCS Phosphate Co.*, the court considered a dispute between a rail carrier and a mine operator over a covenant in the deed conveying an easement to the rail carrier that required the carrier to relocate its rail line to another portion of the mine operator's property if the mine operator deemed the relocation necessary for mine operations. *Id.* at 215. In rejecting the rail carrier's contention that enforcing the covenant would unreasonably interfere with rail transportation, the court explained that the carrier's agreement to the covenant's terms "reflect[ed] a market calculation that the benefits of operating the rail line for many years would be worth the cost of paying to relocate the line in the future." *Id.* at 221. In light of that cost-benefit analysis, the court concluded that any interference with rail transportation caused by the relocation could not be deemed unreasonable. *Id.* For that reason, enforcement of the agreement was not impliedly preempted by the ICCTA. *Id.* at 222.

¶ 33    The Board reached a similar result in *Township of Woodbridge*, 5 S.T.B. 336, 2000 WL 1771044 (Nov. 28, 2000). At issue there was an agreement between a rail carrier and a local government in which the carrier agreed "to curtail the idling of locomotives and the switching of rail cars" during overnight hours to address noise complaints from local residents. *Id.* at *1. When the local government sought to enforce the agreement, the rail carrier argued that the action was preempted by the ICCTA. *Id.* at *2. In rejecting that contention, the Board explained that the carrier's "voluntary agreements must be seen as reflecting the carrier's own determination and

admission that the agreements would not unreasonably interfere with interstate commerce." *Id.* at *3. Because the carrier "ha[d] not shown that enforcement of its commitments would unreasonably interfere with the railroad's operations," the local government's action was not preempted by the ICCTA. *Id.*

¶ 34    The agreement that Burgoyne seeks to enforce here is fundamentally distinguishable from the agreements in *PCS Phosphate Co.* and *Township of Woodbridge*. While a rail carrier may voluntarily commit to relocate a line or reduce noise produced by its operations without necessarily causing an unreasonable interference with rail transportation, it "cannot voluntarily contract away [the STB's] jurisdiction over the abandonment of [its] [l]ine." *Salt Lake City Corp.*, STB Docket No. AB-33 (Sub-No. 183), 2002 WL 368014, at *5 (Mar. 8, 2002). As discussed above, granting Burgoyne's requested relief would prevent CTR from conducting service over its rail line and would result in an unauthorized abandonment of the line. Thus, even though Burgoyne's claims arise from a voluntary agreement, we conclude that its claims are preempted by the ICCTA because its requested relief would unreasonably interfere with rail transportation.[3]

¶ 35    We are similarly unpersuaded by Burgoyne's reliance on decisions concerning a state court's authority to adjudicate property claims with respect to "the size and extent of a railroad easement." *Allegheny Valley R.R. Co.*, STB Finance Docket No. 35388, 2011 WL 1546589, at *3 (Apr. 25, 2011). The dispute here concerns the existence of an easement rather than its size and extent, and that distinction is critical. In *Allegheny Valley*, the parties' "primary

---

[3] Burgoyne contends that a different result is warranted here because the corrective deed was issued in the course of railroad reorganization proceedings overseen by a federal bankruptcy court. Burgoyne asserts that the ICC was a party to the bankruptcy proceeding and was "fully aware" of the terms of the corrective deed. Even if true, we see nothing in the terms of the deed or the circumstances surrounding its execution that suggest that either the bankruptcy court or the ICC preemptively authorized a future abandonment of the rail line.

dispute *** involve[d] the size, location, and nature of property rights for the [rail carrier's] right-of-way," issues that "involve[d] the application of state property law and properly [were] before the state court." *Id.* at *4. The Board stressed, however, that the parties agreed "that a railroad right-of-way exist[ed]" and that the rail carrier "[had] the right to conduct rail operations within the *** right-of-way." *Id.* Here, in contrast, Burgoyne disputes the continued existence of CTR's easement and seeks an order that would prevent CTR from conducting rail operations over the right-of-way. Unlike the types of property claims that may proceed in state court, Burgoyne's claims, if successful, would prevent or unreasonably interfere with rail transportation and are thus preempted by the ICCTA. See *Jie Ao and Xin Zhou*, STB Finance Docket No. 35539, 2012 WL 2047726, at *6 (June 6, 2012) (finding state-law adverse possession claim preempted because it sought "to claim title to a strip of rail-banked [right-of-way] that is within the national rail network system and has not been abandoned").

¶ 36    We also conclude that Burgoyne's claims are preempted by the Trails Act. After Alloy filed a petition for the adverse abandonment of CTR's rail line, the City submitted a request for interim trail use as an alternative to abandonment. Under the Trails Act and the STB's rules, the Board issued a CITU that allowed the City and CTR to negotiate an agreement for interim trail use. See 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29. If the parties had failed to reach an agreement, CTR would have been authorized to abandon the line (*Preseault*, 494 U.S. at 7) and Burgoyne would have been able to enforce the terms of the corrective deed terminating CTR's easement due to its nonuse for railroad purposes. Because the parties were able to reach an agreement, however, the CITU blocked the line from being abandoned and authorized CTR to transfer the right-of-way to the City for interim trail use, "subject to restoration or reconstruction for railroad purposes."

16 U.S.C. § 1247(d). The Trails Act provides that "such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." *Id.* The Trails Act thus "prevent[s] [Burgoyne's] property interests [in the right-of-way] from reverting under state law" (*Preseault*, 494 U.S. at 8) and preempts its claims seeking to enforce the easement's termination.

¶ 37    Burgoyne attempts to avoid the preemptive effect of the Trails Act on several grounds, but none is availing. First, Burgoyne relies on *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93 (2014), but that case simply applied "basic common law principles" to a dispute over reversionary interests in a railroad easement that terminated due to nonuse. *Id.* at 106.[4] The decision did not consider any issue under the Trails Act, nor does anything in the opinion suggest that the easement had been transferred for interim trail use. The decision thus has no bearing on the preemption question we address here.

¶ 38    Next, Burgoyne argues that the Trails Act does not prevent enforcement of its reversionary interest because that interest arises from the terms of a corrective deed rather than state property law. But the Trails Act states that interim trail use "shall not be treated, for purposes of *any law or rule of law*, as an abandonment of the use of such rights-of-way for railroad purposes." (Emphasis added.) 16 U.S.C. § 1247(d). That language is broad enough to encompass any reversionary interest triggered by nonuse of an easement for railroad purposes, whether the interest arises from

---

[4] The Court also explained that "it does not make sense under common law property principles to speak of the grantor of an easement having retained a 'reversionary interest.'" *Marvin M. Brandt Revocable Trust*, 572 U.S. at 105 n.4. Instead, the grantor of an easement retains its ownership interest in the property subject to an easement, and that interest returns to its unencumbered state when the easement terminates. See *id.* at 105. "Under either characterization the result upon termination of the easement is the same." *Preseault v. United States*, 100 F.3d 1525, 1534 (Fed. Cir. 1996). Because rails-to-trails cases generally employ the "reversionary interest" terminology, see, *e.g.*, *Preseault*, 494 U.S. at 8, we do so here as well.

property law or a contractual arrangement. In *Preseault*, the Court held that the Trails Act "prevent[s] property interests from reverting under state law." 494 U.S. at 8. We see no reason to think that the Court meant to distinguish between different sources of state law. Whether Burgoyne's reversionary interest arises under state property law or state contract law does not affect the preemption analysis.

¶ 39    Burgoyne also contends that the Trails Act cannot prevent enforcement of its reversionary interest in the right-of-way because CTR's easement terminated *before* the STB authorized interim trail use. But the same was true in *Preseault*, where the rail carrier ceased operations and removed its tracks from the right-of-way well in advance of any request for interim trail use. *Preseault*, 494 U.S. at 9; see *Trustees of the Diocese of Vermont v. State*, 496 A.2d 151, 152 (Vt. 1985) (prior state court decision in the case). Indeed, one of the issues in the landowners' subsequent suit seeking compensation for an alleged taking was whether the "easements [had] terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements." *Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996). The resolution of that question was relevant in determining whether any state law property rights were taken from the landowners as a result of the right-of-way's conversion to interim trail use (see *id.* at 1544-45), but the timing of the conversion did not affect the validity of the CITU and was immaterial to the preemption question addressed by the Supreme Court.

¶ 40    Finally, Burgoyne directs our attention to *Monroe County Comm'n v. A.A. Nettles, Sr. Properties Ltd.*, 288 So. 3d 452 (Ala. 2019). There, under circumstances similar to those presented here, the Alabama Supreme Court held that a landowner's state law action to quiet title to a former railroad right-of-way that had been converted to interim trail use was not preempted by federal law

because the state law principles governing limited-use easements did not "attempt[ ] to regulate rail transportation [or] limit the use of rail property to deter interstate commerce." *Id.* at 457. The court thus approved the state trial court's application of "state-law principles to conclude that the right-of-way had been extinguished by operation of law [when it ceased to be used for railroad purposes], causing title to the right-of-way to revert" to the abutting landowner. *Id.* at 459. The court did not explain how the application of state law in this context was consistent with the Trails Act's admonition that interim trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). Nor did the court discuss *Preseault*'s holding that the Trails Act "prevent[s] property interests from reverting under state law" when a railroad right-of-way is converted to interim trail use. 494 U.S. at 8. We are, of course, not bound by the decision of a sister state court. See *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 82. Respectfully, we are unpersuaded by the decision in *Nettles* and thus decline to follow it. Rather, as discussed above, we conclude that enforcement of any reversionary interest Burgoyne may hold in the right-of-way under state contract or property law is preempted by the Trails Act.

¶ 41    In closing, we note that this result does not leave Burgoyne without a remedy. As the circuit court recognized, to the extent that application of the Trails Act effected a taking of its reversionary interest in the right-of-way, Burgoyne may seek compensation for the taking in the United States Court of Federal Claims under the Tucker Act (28 U.S.C. § 1491(a)(1)). See *Preseault*, 494 U.S. at 11-17. Contrary to Burgoyne's suggestion, recognizing the Trails Act's preemptive effect will not leave the nature and scope of its property rights unresolved. "Although [the Trails Act] may pre-empt the operation and effect of certain state laws [governing reversionary interests]," it does

"not displace state law as the traditional source of the real property interests" that are affected. *Preseault*, 494 U.S. at 22 (O'Connor, J., concurring, joined by Scalia and Kennedy, JJ.). Thus, when considering any takings claim that Burgoyne may bring, the federal court of claims will consider "the nature of the state-created property interest that [Burgoyne] would have enjoyed absent" application of the Trails Act and "the extent that [application of the Trails Act] burdened that interest." *Id.* at 24. As in all rails-to-trails takings cases, moreover, the court will "analyze the property rights of the parties *** under the relevant state law." *Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015).

¶ 42                                    III. CONCLUSION

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 44    Affirmed.

No. 1-19-0098

---

| | |
|---|---|
| **No. 1-19-0098** | |

---

| **Cite as:** | *Burgoyne, LLC v. Chicago Terminal R.R. Co.*, 2020 IL App (1st) 190098 |

---

| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-6199; the Hon. Pamela McLean Meyerson, Judge, presiding. |

---

| **Attorneys for Appellant:** | George S. Bellas and Misty J. Cygan, of Bellas & Wachowski, of Park Ridge, for appellant. |

---

| **Attorneys for Appellee:** | Mark A. Flessner, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Elizabeth Mary Tisher, Assistant Corporation Counsel, of counsel), for intervenor-appellee.

No brief filed for other appellees. |

---